# 14-1125-cv

IN THE

## United States Court of Appeals

### FOR THE SECOND CIRCUIT



FERNANDO BERMUDEZ,

*Plaintiff-Appellant,*

*v.*

CITY OF NEW YORK, MICHAEL LENTINI, WILLIAM FITZPATRICK, DANIEL MASSANOVA, JOHN MULALLEY, BAKER, (FIRST NAME UNKNOWN), MULCAHY, (FIRST NAME UNKNOWN), VARIOUS JOHN DOES, WHO ARE OR WERE OFFICES OF THE NEW YORK CITY POLICE DEPARTMENT, INDIVIDUALLY & IN THEIR OFFICIAL CAPACITY, VARIOUS JANE DOES, WHO ARE OR WERE OFFICES OF THE NEW YORK CITY POLICE DEPARTMENT, INDIVIDUALLY,

*(Additional Caption on the Reverse)*

*On Appeal from the United States District Court for the Southern District of New York (New York City)*

## BRIEF AND SPECIAL APPENDIX FOR PLAINTIFF-APPELLANT

LAW OFFICES OF MICHAEL S. LAMONSOFF
*Attorneys for Plaintiff-Appellant*

By: POLLACK, POLLACK, ISAAC
& DE CICCO, LLP
*Appellate Counsel*
225 Broadway, Suite 307
New York, New York 10007
212-233-8100

Robert M. Morgenthau, individually & in his official capacity as former District Attorney of New York County, Nancy Ryan, individually & in her official capacity as Assistant Attorneys of New York County, James Rodriguez, individually & in his official capacity as Assistant Attorneys of New York County, Robin McCabe, individually & in their official capacity as Assistant Attorneys of New York County, Mary C. Farrington, individually & in their official capacity, Hilary Hassler, individually & in their official capacity as Assistant Attorneys of New York County, Herculano Izquierdo, individually & in their official capacity as Assistant Attorneys of New York County,

*Defendants-Appellees.*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES .......................................iii

PRELIMINARY STATEMENT .........................................1

JURISDICTIONAL STATEMENT ......................................1

INTRODUCTION ..................................................2

STATEMENT OF FACTS AND PROCEDURAL HISTORY ....................8

    A.  Blount's Murder .....................................8

    B.  Unduly Suggestive Identifications ...................8

    C.  Initial Custodial Interrogation Of Lopez ..........10

    D.  Ada Rodriguez's Interrogation Of Bermudez .........11

    E.  Rodriguez's Interrogations Of Lopez ...............12

    F.  Five Identification Witnesses Recant ..............13

    G.  Det. Massanova Is Informed About
        The Real Wool Lou .................................19

    H.  Decision Granting Bermudez's §440.10 Motion .......20

    I.  Current Litigation ................................20

ARGUMENT .....................................................22

POINT I

    ADA RODRIGUEZ WAS ACTING IN AN INVESTIGATIVE CAPACITY
    WHEN HE INTERROGATED LOPEZ ON AUGUST 6, 1991 ..........22

    A.  Law Regarding Prosecutorial Immunity ..............23

POINT II

    ADA RODRIGUEZ IS NOT PROTECTED BY PROSECUTORIAL
    IMMUNITY WHEN HE KNEW OR HAD REASON TO KNOW THAT
    LOPEZ WAS NOT TELLING THE TRUTH WHEN HE
    INTERROGATED HIM ON AUGUST 6, 1991 ...................35

POINT III

THE COMPLAINT SHOULD BE REINSTATED
AGAINST THE POLICE DEFENDANTS ...........................42

A.  Probable Cause ...................................44

B.  Suggestive Identifications; Coerced Testimony ......48

C.  The Chain Of Causation Was Not Broken .............49

D.  Qualified Immunity ...............................53

E.  Malicious prosecution ...........................56

     (1) Det. Massonava ..............................58

F.  Brady Claim ......................................59

CONCLUSION ..............................................61

CERTIFICATE OF COMPLIANCE ...............................62

**Federal Cases**

Absolute Activist Value Master Fund Ltd. v. Ficeto,
  677 F3d 60 (2d Cir. 2012) .................................... 22

Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.,
  145 F.3d 543 (2d Cir. 1998) ................................. 42

Anderson v. Liberty Lobby, Inc., 477 US 242 (1986)........... 43

Arista Records, LLC v. Doe 3, 604 F.3d 110 (2d Cir. 2010)..... 23

Ashcroft v. Iqbal, 556 US 662 (2009)...................... 22, 23

Barr v. Abrams, 810 F.2d 358 (2d Cir. 1987).............. 32, 33

Benjamin v. Coughlin, 905 F.2d 571 (2d Cir. 1989)............. 42

Boyd v. City of New York, 336 F.3d 72 (2d Cir. 2003)......... 48

Buckley v. Fitzsimmons, 509 US 259 (1993)................. passim

Burns v. Reed, 500 US 478 (1991)......................... passim

Cameron v. City of New York, 598 F.3d 50 (2d Cir. 2010)....... 50

Conway v. Vill. of Mount Kisco, NY,
  750 F.2d 205 (2d Cir. 1984) ................................ 56

Cornejo v. Bell,592 F.3d 121 (2d Cir. 2010) ................... 32

Day v. Morgenthau, 909 F.2d 75 (2d Cir. 1990)............. 32, 33

Fields v. Wharrie, 740 F.3d 1107 (7th Cir. 2014) ......... 38, 44

Forrester v. White, 484 US 219 (1988)........................ 23

Genzler v. Longanbach, 410 F.3d 630 (9th Cir. 2005) ....... passim

Geter v. Fortenberry, 849 F.2d 1550 (5th Cir. 1988) ....... 43, 60

Good v. Curtis, 601 F.3d 393 (5th Cir. 2010) ................. 44

Gregory v. City of Louisville, 444 F.3d 725............... 7, 54

Harlow v. Fitzgerald, 457 US 800 (1982)...................... 40

Higazy v. Templeton, 505 F.3d 161 (2d Cir. 2007)............. 50

Hill v. City of New York, 45 F.3d 653 (2d Cir. 1995)......... 37

iii

Imbler v. Pachtman, 424 US 409 (1976).................... 24, 53

Johnson v. Dossey, 515 F.3d 778 (7th Cir. 2008) .............. 59

Jones v. City of Chicago, 856 F.2d 985 (7th Cir. 1993) .... 40, 55

Kalina v. Fletcher, 522 US 118 (1997)................. 5, 23, 24

Kirby v. Illinois, 406 US 682 (1972)......................... 44

Korthas v. City of Auburn,
   2006 WL 1650709 (NDNY June 9, 2006) ........................ 57

KRL v. Moore, 384 F.3d 1105 (9th Cir. 2004) ................. 24

Kulwicki v. Dawson, 969 F.2d 1454 (3d Cir. 1992).............. 29

Kyles v. Whitley, 514 US 419 (1995)......................... 60

Lowth v. Town of Cheektowaga,  82 F.3d 563 (2d Cir. 1996)..... 57

Manetta v. Macomb County Enforcement Team,
   141 F.3d 270 (6th Cir. 1998)................................ 30

Manganiello v. City of New York,
   612 F.3d 149 (2d Cir. 2010) ........................... 46, 47

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
   475 US 574 ................................................. 43

McGhee v. Pottawattamie County,
   547 F.3d 922 (8th Cir. 2008)........................... 37, 39

Messerschmidt v. Millender, 132 S. Ct. 1235 (2012)........... 60

Milstein v. Cooley, 257 F.3d 1004 (9th Cir. 2001) ...... 6, 37, 38

Moore v. Valder, 65 F.3d 189................................ 39

Neil v. Biggers, 409 US 188 (1972).......................... 55

Newsome v. McCabe, 319 F.3d 301 (7th Cir. 2003) .............. 44

Parratt v. Taylor, 451 US 527 (1981)........................ 44

Patane v. Clark, 508 F.3d 106 (2d Cir. 2007)................. 22

Pepsico, Inc. v. Coca-Cola Co., 315 F.3d 101 (2d Cir. 2002)... 42

Perry v. New Hampshire, 132 S.Ct. 716 (2012).................. 55

Rex v. Teeples, 753 F.2d 840 (10th Cir. 1985),
  cert. denied, 474 US 967 ................................. 6, 34

Ricciuti v. New York City Transit Auth.,
  124 F.3d 123 (2d Cir. 1997) ................................. 43

Robison v. Via, 821 F.2d 913 (2d. Cir. 1987) ................. 32

Roe v. People of State of N.Y., 363 F.Supp. 788 (WDNY 1973),
  judgment aff'd, 495 F2d 764 (2d Cir. 1974) ................. 51

Savino v. Town of Se., 2014 WL 3036081
  (2d Cir. July 7, 2014) ..................................... 54

Scheuer v. Rhodes, 416 US 232 (1974) ......................... 22

Simmons v. US, 390 US 377 (1968) ..................... 44, 49, 54

Simon v. City of New York,
  727 F.3d 167 (2d Cir. 2013) ..................... 6, 30, 31, 35

Solomon v. Smith, 487 F.Supp. 1134 (SDNY 1980),
  judgment aff'd, 645 F.2d 1179 (2d Cir. 1981) ............... 51

Stansbury v. Wertman, 721 F.3d 84 ......................... 7, 54

Steidl v. Fermon, 494 F.3d 623 (7th Cir. 2007) ............... 60

Stovall v. Denno, 388 US 293-02 (1967),
  overruled on other grounds by, Griffith v. Kentucky,
  479 US 314 (1987) ......................................... 48

Strickler v. Greene, 527 US 263 (1999) ...................... 60

Tellabs, Inc. v. Makor Issues & Rights, Ltd.,
  127 S.Ct. 2499 (2007) ..................................... 41

US v. Cueto, 611 F.2d 1056 (5th Cir. 1980) .................. 51

US v. Sanders, 479 F.2d 1193 (D.C. Cir. 1973) ............... 51

US v. Wade, 388 US 218 (1967) ........................... 48, 49

Walczyk v. Rio, 496 F.3d 139 (2d Cir. 2007) ................. 54

Whitlock v. Brueggemann, 682 F.3d 567 (7th Cir. 2012),
  cert. denied, 133 S. Ct. 981 ......................... *passim*

Zalaski v. City of Hartford, 723 F.3d 382 (2d Cir. 2013) ...... 54

Zellner v. Summerlin, 494 F.3d 344 (2d Cir. 2007)............. 54

**State Cases**

Jestic v. Long Island Sav. Bank, 81 AD2d 255 [2d Dept. 1981].. 58

Martin v. City of Albany, 42 NY2d 13 [1977].................... 58

Martinez v City of Schenectady, 97 NY2d 78 [2001]............ 56

Nardelli v. Stamberg, 44 NY2d 500 [1978]..................... 57

People v. Bournes, 60 AD3d 687 (2d Dept. 2008)............... 36

People v. Riley, 70 NY2d 523 (1987).......................... 48

People v. Savvides, 1 NY2d 554 (1956)........................ 36

**Federal Statutes**

18 USC §1961 et seq.,........................................ 1

28 USC §1291................................................ 2, 21

28 USC §1331................................................ 1

28 USC §1367(a).............................................. 1

28 USC §1738................................................ 42

42 USC §1983.......................................... *passim*

42 USC §1988................................................ 56

**State Statutes**

New York Criminal Procedure Law 440.......................... 52

New York Criminal Procedure Law §440.10...................... 20

**Federal Rules**

Fed.R.Civ.P. 56(c)........................................... 42

**Other Authorities**

15A Fed. Prac. & Proc. Juris. §3905 (2d ed.)................. 21

5B Fed. Prac. & Proc. Civ. §1357 (3d ed.)................... 41

Eyewitness Identification: Legal &
  Practical Problems 2d §5:11 ................................. 48

Eyewitness Identification: Legal &
  Practical Problems 2d §6:12 ................................. 51

Obstacles to Litigating Civil Claims for Wrongful Conviction:
  An Overview, 18 B.U. Pub. Int. L.J. 439 (2009) .............. 53

Police Misconduct: Law and Litigation §12:28............. 44, 49

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**
-------------------------------------X     **Docket No.**
FERNANDO BERMUDEZ,                          **14-1125-CV**

            Plaintiff-Appellant,     **APPELLANT'S BRIEF**

THE CITY OF NEW YORK, JAMES
RODRIGUEZ, individually and
as Assistant District
Attorney of New York County,
et al.,

            Defendants-Appellees.
-------------------------------------X

## PRELIMINARY STATEMENT

The plaintiff-appellant, Fernando Bermudez (hereinafter the "plaintiff" and/or "Bermudez") submits this brief in connection with the appeal he took from a final order [Dkt. 70] and final judgment [Dkt. 71] of the District Court for the Southern District of New York (Preska, J.), which granted the defendants' motion for summary judgment and closed the case.

## JURISDICTIONAL STATEMENT

This appeal arises from a final order and judgment of the district court for the Southern District of New York dated entered March 28, 2014 (Preska, USDJ.), which dismissed plaintiff's complaint. The bases for subject matter jurisdiction in the district court were federal question jurisdiction, pursuant to 28 USC §1331 and 18 USC. §1961 et seq., and principles of supplemental jurisdiction, pursuant to 28 USC §1367(a).

This Court has jurisdiction over this appeal pursuant to 28 USCA §1291, as it arises from a final order and judgment.

## INTRODUCTION

Bermudez commenced this action under 42 USC §1983 against the above-named defendants for various State and Federal Constitutional and civil rights violations, including but not limited to, false arrest, false imprisonment, malicious prosecution, denial of the claimants right to due process, falsification of documents, denial of the right against self-incrimination, denial of the right to counsel and conspiracy to commit each of these acts, resulting in the deprivation of the plaintiff's constitutional rights.  Defendants' acts caused Bermudez to be confined in state prison for eighteen years for a crime that he did not commit.  Indeed, Bermudez was eventually declared entirely innocent.  The defendants will not dispute this incontrovertible fact.

This gross miscarriage of justice began when the defendants falsely arrested Bermudez on August 6, 1991 for the murder of a man he never met, Raymond Blount.  Bermudez was tried, wrongly convicted and sentenced to 23 years in prison.  After serving 18 years of his 23-year sentence, Bermudez was released from prison pursuant to an order of the Supreme Court, New York County (J. Cataldo, JSC), dated November 9, 2009, declaring Bermudez innocent of the murder (677-708).  The court also vacated the

conviction because Assistant District Attorney James Rodriguez ["Rodriguez"], the man who prosecuted Bermudez, knew or should have known that material evidence that Rodriguez adduced at trial was false and because the police defendants employed unduly suggestive identification procedures (id).

To put it mildly, the actions of the police defendants and ADA Rodriguez were criminal. They coerced witnesses to testify falsely and suborned perjury. Most importantly, the defendants knew that an innocent man was being prosecuted for a crime he did not commit. The person who killed Blount was Luis Munoz who was also called "Wool Lou". Munoz shot Blount in retaliation for assaulting his friend, Efrain Lopez. Lopez, who was only sixteen years old at the time, was taken into custody the following day.

Detective Daniel Massonava showed Lopez a picture of Bermudez, told Lopez that Bermudez was a drug dealer and that if Lopez didn't identify Bermudez as the shooter, Lopez would be charged for killing Blount. The following day, Rodriguez interrogated the plaintiff and Lopez within a two-hour time frame in an attempt to get them to testify against one another. Bermudez continually maintained his innocence. Lopez, who was connected with the killing, agreed to testify against the innocent plaintiff to avoid his own criminal prosecution and

inculpate his friend, Luis Munoz.  It is uncontroverted that Lopez had never met Bermudez but knew that Munoz shot Blount.

When Rodriguez and Massanova interrogated Lopez, Lopez told them that the shooter's name was Luis or Lou and went by the nickname of "Wool Lou" because he sold wools, which was slang for crack cocaine rolled up in cigarettes or reefer.  Lopez also told them that Lou lived near his grandmother's apartment on West 91 Street.  Nevertheless, after this interrogation yielded the name of the shooter, through the actions of defendants, Bermudez became Wool Lou and would be prosecuted for a murder he unquestionably did not commit.

No one had ever called Bermudez "Lou" or "Wool Lou" at any time in his life.  He went by the nickname "Most" which Lopez did not know.  At trial, ADA Rodriguez asked Lopez if he knew someone named "Woolu".  When Lopez replied in the affirmative, Rodriguez asked if he knew "Woolu's" real name.  Rodriguez then suborned perjury when Lopez claimed he did not – even though Lopez had told the ADA and Det. Massanova that Wool Lou's real name was Luis or Lou.  Lopez also testified that although he knew that "Wool" meant crack, he did not know what the "lu" part of the name meant. (689–90).  At the time that he solicited this testimony, ADA Rodriguez knew that the shooter's name was Lou or Luis and not Fernando Bermudez.

When ADA Rodriguez and Det. Massanova both interrogated Lopez on August 6, ADA Rodriguez had further reason to know that Bermudez was not the man that shot Blount. Bermudez lived at 590 West 204th Street, miles from Lopez, who lived with his grandmother at 74 West 91st Street.

Justice Cataldo stated:

These repeated references to Lou as the shooter's name, and even a reference to the name Luis, posed a dilemma for the prosecution of a man named Fernando with a nickname of "Most." This dilemma was never placed before the jury. At trial the shooter's name changed to Woolu; wherein Woolu meant cocaine rolled in tobacco and where the "lu" portion of the name no longer had any known significance to Lopez, except as a possible nickname.

[683]

Nevertheless, despite these flagrant violations, the district court granted Rodriguez's motion to dismiss on the ground that he was entitled to absolute immunity. The court reasoned that when Rodriguez and Det. Massanova interrogated Lopez in tandem two days after the shooting, Rodriguez was not functioning in an investigative capacity because Bermudez had already been arrested.

We respectfully submit that the district court's holding was wrong as a matter of law. It is true that a prosecutor is protected by absolute immunity "when performing the traditional functions of an advocate" (Kalina v. Fletcher, 522 US 118, 131 (1997). However, prosecutors are entitled to only qualified

immunity, when they perform "investigative functions normally performed by a detective or police officer" (Burns v. Reed, 500 US 478, 494-96 (1991).

When Rodriguez and Det. Massanova questioned Lopez it was a unquestionably a custodial interrogation. "[P]rosecutorial immunity [is] inapplicable" to "[p]rosecutorial conduct relating to witness interviews" (2 Nahmod, Civil Rights & Civil Liberties Litigation: The Law of Section 1983 §7:50).

"Giving Miranda warnings and participating in the interrogation of a suspect" is a "non-advocacy function[]...not governed by absolute prosecutorial immunity" (Sec. 1983 Litig. §9.05, citing, Rex v. Teeples, 753 F.2d 840 (10th Cir. 1985), cert. denied, 474 US 967). "Police officers and a prosecutor who engage in extended detention and interrogation...are, as a matter of law, engaged in an investigative function that entitles them to, at most, qualified immunity" (Simon v. City of New York, 727 F.3d 167, 174 (2d Cir. 2013).

ADA Rodriguez is "not entitled to absolute immunity if one accepts as true the allegations that [he] knowingly obtained false statements from [Lopez] for the purpose of prosecuting [Bermudez]" (Milstein v. Cooley, 257 F.3d 1004, 1011 (9th Cir. 2001).

The district court also granted the police defendants' motion for summary judgment. It reasoned that ADA Rodriguez's

acts of interviewing witnesses and prosecuting Bermudez was a superseding cause of police misconduct leading plaintiff's conviction and imprisonment. This was incorrect. Before Rodriguez interrogated Lopez, Det. Massanova threatened Lopez that if he did not identify Bermudez as the killer, Lopez would be charged as the shooter. In addition, there is no dispute on this record that Rodriguez was not informed about the unduly suggestive identification procedure employed by the detectives, and that Lopez was coerced into framing Bermudez. Thus, it cannot be said as a matter of law on defendants' motion to dismiss that these egregious violations played no part in ADA Rodriguez's decision to prosecute Bermudez.

The district court also determined that because the suggestive identifications established probable cause to charge Bermudez, the police defendants were entitled to qualified immunity. That was also error. Indeed, identifications of suspects obtained by the police using highly unreliable photo arrays cannot be the sole basis for probable cause (see, Gregory v. City of Louisville, 444 F.3d 725, 743–46 (6th Cir. 2006); Stansbury v. Wertman, 721 F.3d 84, 90–91 (2d Cir. 2013). The knowingly tainted identifications and coerced false testimony could not support a finding of probable cause required to arrest and prosecute Bermudez. The complaint should be reinstated in its entirety.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

### A.    Blount's Murder

Fernando Bermudez' eighteen years of wrongful incarceration actually began on August 4, 1991, at about 3:10 a.m. when a man he never met, Raymond Blount, was shot to death as Blount left a club called the Marc Ballroom, also known as the Romper Room, located at University Place and 13th Street, in New York County. Earlier that evening, while inside the Marc Ballroom, Blount had been involved in a fight with another man that Bermudez had never met, a sixteen year old named Efraim Lopez (678). Lopez was known as "Pico" or "Shorty." (678).

Sometime around midnight, Blount had punched Lopez in the face, giving him a black eye. About one half hour to 45 minutes later, Lopez approached a man standing by himself inside the club, and told the man he had been assaulted (678). He pointed to Blount as the person who had punched him. Later outside the club, the man again asked Lopez to point out the person who had hit him. Lopez pointed to Blount. The man approached Blount and shot him (678).

### B.    Unduly Suggestive Identifications

The four eyewitnesses who testified for the prosecution at trial were Okpa Iyesi, Jaime Velasquez, Frank Kent and Michael Thompson (691). Subsequent to Bermudez's trial, all four eyewitnesses recanted their identifications (691). There is no

dispute that their identifications, which we now summarize, were unduly suggestive.

On August 5, 1991, at approximately 5:00 p.m. Detectives Michael Lentini and William Fitzpatrick took the four witnesses mentioned above, as well as Lawrence Darden, Nkosi Boyce, and Terrence Hall, who were also at the club when Blount was killed, to the CATCH unit to view photographs.[1]

Once at the CATCH Unit, Det. Lentini asked the group of witnesses for a collective description of the shooter (294). The witnesses collectively described the shooter as a 16-to-26-year-old male Hispanic approximately 5'11" tall and weighing 165 pounds; they also described what Lopez looked like (295-296). Det. Lentini then pulled drawers of photographs based on the description of Bermudez and Lopez (296-297).

The seven witnesses then viewed the photographs together as a group; they all discussed the photographs and were joking around (1112, 1116). Velasquez saw a picture of Bermudez and thought he was cute (694). After Velasquez gave Bermudez's photograph to Det. Lentini, the detectives immediately ended the viewing procedure. "Ending the procedure immediately after Jaime made a selection, sent a clear signal that Jaime had found the person they were looking for, the shooter" (699).

---

[1] The NYPD maintains a CATCH Unit in each borough; it is where photographs of prior arrestees are housed and cataloged by location of arrest and pedigree information, including ethnic background, age, height, and weight. [291]

Det. Massanova then constructed a series of photo arrays, including one that contained a photograph of Bermudez, "once again reinforcing their choice from the CATCH unit" (699). Det. Massanova didn't ask the witnesses if they recognized anyone, but instead, instructed them to look at the photos and decide which person was responsible (699)[2].

Later that day, when Iyesi saw Bermudez sitting down in a lineup he told the detectives he didn't believe Bermudez was the shooter (605). In addition, Kent never made a positive identification of the shooter (602). Thompson tried to tell the ADA and detectives that he was not sure of seeing Bermudez on the night in question, "but they did not want to hear it" (609). At the lineup, Velasquez "kept telling anyone who would listen that [she] did not see the actual shooting of Raymond Blunt" (599).

## C.    Initial Custodial Interrogation Of Lopez

On August 5, 1991, Lopez was taken into police custody, given Miranda warnings and interrogated by Det. Daniel Massanova (678). Det. Massanova showed Lopez a photo of Bermudez, said he was a drug dealer and that if Lopez did not identify him as the person who killed Blunt, he would be charged as the shooter (972). Thereafter, Lopez gave three written statements (678).

---

[2] These identifications were held to be unduly suggestive (684, 686, 688).

In the first, Lopez did not admit to knowing the shooter. (678). In his second, Lopez indicated he knew the shooter and that his street name was Wool Lou (678). In his third written statement, Lopez indicated he had been shown photographs and number "2" was the shooter (678). Lopez indicated the shooter was from his neighborhood and his street name was Wool Lou. He stated he had observed Wool Lou entering 74 West 92nd Street, the building his grandmother lived in (678).

**D.   Ada Rodriguez's Interrogation Of Bermudez**

On August 5, at approximately 5:00 p.m., ADA Rodriguez and Det. Massanova conducted a videotaped interrogation of Bermudez, who had been taken into custody after the eyewitnesses selected his photograph. Bermudez lived over six miles north of Lopez, at 590 West 204th Street in Inwood (698). Rodriguez told Bermudez that "Shorty," or "Efrain Lopez," had identified him as the shooter and that if Bermudez did not inculpate Lopez he would be the only person punished for a homicide for which "Shorty" was largely to blame (17.18).

Bermudez denied any involvement in the shooting and denied being near the Marc Ballroom on August 3 or 4, 1991. After learning of his arrest, Bermudez's friends went to the sixth precinct and told police officers that they had been with him during the evening of August 3 and the early morning of August 4, 1991, and they had not been at or near the Marc Ballroom.

However, no investigation independent of Lopez's statements or the tainted identification was ever undertaken (698). The pace of events leading to Bermudez's wrongful imprisonment began to accelerate.

**E.   Rodriguez's Interrogations Of Lopez**

Shortly thereafter, on August 5, at approximately 7:00 p.m. ADA Rodriguez and Det. Massanova conducted a videotaped interrogation of Lopez, who, up to that point, had been in custody for about 30 hours (858-933). Rodriguez read Lopez his Miranda rights (859-60) and then proceeded to interrogate him in tandem with Det. Massanova; they both questioned Lopez extensively about the events that led up to his fight with Blount, the larger altercation which occurred after Blount assaulted him and the shooting (864-88).

During the interrogation, Lopez told Rodriguez and Massanova that after he was assaulted, a guy named "Lou" asked him what happened (875-76). Lopez had no relationship with this person, but he "knew his name was Lou" and "they use to call him Wool Lou" (877). This was because Wools was slang for crack cocaine that was inserted into cigarettes and Lou sold Wools (877). Wool Lou hung out near Lopez's grandmother's building, located at 74 West 92nd Street (876, 910).

When asked about the nickname "Most" (Bermudez's nickname) (680), Lopez did not recognize it (876). Nevertheless, as Det.

12

Massanova had previously told Lopez that he would be charged with killing Blount if he didn't identify Bermudez as the shooter, when Lopez was shown a photo of Bermudez, Lopez identified him as Wool Lou (894).

Based on the following colloquy, it was evident that Det. Massanova did not tell ADA Rodriguez that he coerced Lopez into identifying Bermudez as Wool Lou:

> MR. RODRIGUEZ: This is the same photo array that you showed him a–– yesterday?
>
> DETECTIVE MASSANOVA: And all the other witnesses.
>
> MR. RODRIGUEZ: Okay. And he picked out Number Two?
>
> DETECTIVE MASSANOVA: He indicated before I opened it up.

(894–95).

## F.  Five Identification Witnesses Recant

During the criminal trial, Lopez, Iyesi, Velasquez, Kent and Thompson identified Bermudez as the shooter.  However, after the trial, all five witnesses recanted their identifications of Bermudez as the shooter and submitted affidavits that their testimony was false and secured through coercion (595, 1112–1114, 1132–1134, 1150–1153, 1169–1171).

Lopez maintained in his post trial affidavit that Det. Massanova advised him that Bermudez was a drug dealer and that if he didn't identify Bermudez's as the shooter, Lopez would be charged as the shooter.  Lopez also explained, in contravention

13

of the videotaped statement and trial testimony, that "Wool Lou" was not Bermudez but was Luis Munoz and most importantly, Munoz, not Bermudez, shot Blount (595-596).

In his affidavit, Iyesi stated that he advised Det. Massanova that Blount's shooter was a man with a slim build. Iyesi selected Bermudez when he viewed the lineup on August 6, 1991, because he had a fade-style haircut. Iyesi expressed his doubts to the police and ADA that Bermudez was Blount's shooter. However, ADA Rodriguez threatened to send Iyesi to jail if he refused to identify Bermudez. ADA Rodriguez made references to Iyesi's pending criminal case and that the matter could be disposed of if he testified against Bermudez. Iyesi felt powerless, confused and afraid, due to the ADA Rodriguez's power and his temper (1151-1152).

Thompson, in his affidavit described the shooter 5'8" to 5'9", 160 lbs., with hazel eyes with a fade-style, haircut (1112). He selected Bermudez at the lineup because he recalled seeing his photo at the CATCH Unit. In December 1991, prior to Bermudez's trial, Thompson met with ADA Rodriguez and also expressed doubts about his identification of Bermudez. Thompson told Rodriguez that it was dark and late when Blount was shot and, that during the lineup procedure, Thompson had only seen Bermudez in a seated position and therefore, he could not observe Bermudez's entire body. However, Rodriguez yelled at

14

him and reminded Thompson that he had a criminal charge pending against him which he could help Thompson with if Thompson testified against Bermudez (1113).

Thompson's reluctance to testify persisted.  As a result, Rodriguez requested that a material witness warrant be issued for his arrest.  The warrant was issued and executed; thereafter, Thompson was brought to the prosecutor's office by police officers.  There, he and Kent met with the assigned prosecutor to prepare their trial testimony.  Thompson maintained that, when he was called to testify at the trial, he knew Bermudez was not the person who had shot Blount.  However, the prosecutor told him to say this at the trial (1114).

Kent's affidavit corroborated Thompson's (1169–1171).  Kent was also arrested pursuant to a material witness order.  In January 1992, after he was brought to the prosecutor's office, ADA Rodriguez used pressure to secure trial testimony from him and from Thompson.  Kent claimed that even though he expressed a reluctance to testify, because he could not positively identify Bermudez, the prosecutor employed "some strong persuasion" (1171).

The police and prosecutor pressured Kent "into identifying [Bermudez], at a time when [he] was hurting, hungry and sleepy. [He] was also confused and misled by the questions that were asked by the police and prosecutor".  Kent never made a

"positive" identification of Bermudez or anyone else as the shooter "because [he] didn't see it" (1170)

In her affidavit, Velasquez explained that she no longer believed that her testimony was accurate. She explained that Bermudez's attorney showed her 21 color photographs of male Hispanics in connection with his 440.10 motion. "Something clicked inside [her] when [she] saw these photographs." Velasquez stated in the affidavit that she was able to remember things about the shooting incident more clearly in August 1993 than when they first happened. While she previously believed that Bermudez was the person whom she observed at the scene of Blount's shooting, wearing a chain with medallion and reaching for a gun, she realized, by August 1993, that Bermudez was not that person. "I realize now that I mistakenly identified Fernando Bermudez at trial. He is definitely not the person I saw crossing University with a link and a weapon" (1133).

Velasquez further stated that when she identified Bermudez during the lineup on August 6, 1991, it was based upon a quick glance and her remembrance of the photograph of him that she had seen at the CATCH Unit. She further recalled that when she testified at Bermudez's trial, she tried to avoid looking at him. Velasquez was frightened as detectives falsely told her that Bermudez was a "big drug dealer who could hurt [her]" (1134).

16

Thus, Velasquez wanted to do the right thing at the trial; she did "what [she] came prepared to do," that was, testify against Bermudez. However, she later realized that her identification was erroneous, the product of coercion and undue influence (1134).

Darden and Boyce, also submitted affidavits in support of Bermudez's 440.10 motion which corroborated the statements in affidavits submitted by the others that described a communal review of photographs at the CATCH Unit, with police officers present in the vicinity but not monitoring their viewing of the photographs. They also corroborated the statements made by the others that various photographs were discussed freely and openly, as they were removed from the file cabinet drawers.

Darden indicated that at first, he, Hall and Boyce were examining photographs alone and that the other viewers joined them later. Darden noted that when he discovered Lopez's photograph, Thompson and Iyesi, who were looking over his shoulder, began shouting "that's him; that's him" (614).

Boyce stated that after viewing mug shots at the 6th Precinct, he and several other witnesses were taken to another Precinct to view more photos that were stored in filing cabinets. Although the police detectives were "around", they were not supervising them. The only witness to recognize a photograph was Larry Darden; that was a photograph of Lopez.

17

Then "Opka and Mike saw a picture of Shorty while they were looking over Larry's shoulder.  I recognized no other pictures at the CATCH unit 20th precinct" (612).

Det. Lentini admitted during the Wade Hearing that Lawrence "Truth" Darden, disregarded his instructions not to discuss the photographs when he found the photograph of "Shorty."  Darden yelled out "I found Shorty" and waved the picture in the air. Det. Lentini told him to be quiet and put the photo on the table.  He then took Darden into the supervisor's office and called in the information relating to Shorty (693).

Det. Fitzpatrick confirmed that Det. Lentini had instructed the witnesses not to talk among themselves, however, he admitted that the witnesses did converse.  He described their conversations as "chit chat".  Det. Fitzpatrick also denied that anyone had ever displayed any photographs during the photographic procedures.  This testimony directly contradicted Det. Lentini's testimony, as well as Iyesi's trial testimony, that Darden displayed the photograph of "Shorty" to the other witnesses in the viewing room (693-694).

There is no evidence in the record that these detectives ever advised ADA Rodriguez of the improper suggestive and coercive tactics.

At the Habeas Corpus proceeding, the four eyewitnesses testified they had mistakenly identified Bermudez.  Magistrate

Fox held that the procedures employed by the CATCH Unit were impermissibly "suggestive and conducive to irreparable misidentification" (570). However, Magistrate Fox denied the petition because he found an independent source for the eyewitness identifications based upon their observations of Bermudez at trial (570). District Court Judge Preska adopted the Report and Recommendations in its entirety (656).

## G.    Det. Massanova Is Informed About The Real Wool Lou

Private Investigator Michael Gaynor contacted Det. Massanova prior to Mr. Bermudez's sentencing and thus, prior to the entry of judgment, and furnished him with the information he had obtained that Luis Munoz was the real Wool Lou. He provided Det. Massanova with Luis Munoz's home address, 136 West 91st Street, Apt. Det. Massanova affirmatively stated that he would look into the matter. He indicated, in a tape recorded telephone conversation with Mr. Gaynor, that he would be negligent if he failed to follow up on this lead (690).

Det. Massanova, relayed this information to ADA Rodriguez prior to Bermudez's sentencing. However, "the only inquiry the prosecutor ever made regarding Luis Munoz was to obtain a copy of his criminal history" (690-91). At this point, the die was finally cast and through the actions of the defendants, Bermudez would spend eighteen years of his life in state prison.

## H.    Decision Granting Bermudez's §440.10 Motion

In a subsequent New York Criminal Procedure Law §440.10 motion, Justice Cataldo vacated Bermudez's conviction on the ground that the identification procedures were unduly suggestive, that ADA Rodriguez knew or should have known that Lopez's testimony was false and that Bermudez was innocent (667–708). In reversing Bermudez's conviction, Justice Cataldo stated:

> I find no credible evidence connecting Fernando Bermudez to the homicide of Blount. All of the People's trial evidence has been discredited: the false testimony of Efraim Lopez and the recanted identifications of strangers. No other evidence supports a finding that Mr. Bermudez committed this crime.
>
> I find, by clear and convincing evidence, that Fernando Bermudez has demonstrated he is innocent of this crime (708)[3].

## I.    Current Litigation

Bermudez commenced this action against ADA Rodriguez and the police defendants to recover damages pursuant to 42 USC 1983 by filing an amended verified complaint on June 10, 2011. By notice of motion dated October 3, 2011, ADA Rodriguez moved to dismiss the complaint (18–19).

By order entered September 29, 2012, the district court granted Rodriguez's motion, with an opinion to follow (1576).[4]

---

[3] Justice Cataldo's decision, which is 79 pages long, will be discussed throughout the argument section.

The opinion was entered on February 14, 2013 and granted Rodriguez's motion on the ground that he was protected under the doctrine of absolute immunity (1577–1600). The court reasoned that when Rodriguez arrived at the police station on the morning of August 6, 1991, he "was not functioning in an investigatory capacity at that point in time" because the "[p]laintiff had already been arrested" (1590).

By notice of motion dated April 15, 2013, the police defendants moved for summary judgment (85–87). By order entered March 24, 2014, the district court granted their motion (1601–29). The court found that any misconduct that the police defendants engaged in regarding the suggestive line-ups and coerced testimony was not the proximate cause of Bermudez's unlawful conviction because ADA Rodriguez interviewed the witnesses, drafted the complaint and actively prosecuted Bermudez (1616–21).

The court also held that the police defendants were protected under the doctrine of qualified immunity because their suggestive identification procedures provided probable cause to indict Bermudez (1621–23). Finally, the court dismissed

---

[4] The court initially entered an order on September 29, 2012, merely stating an opinion would follow. The court also entered judgment on September 12, 2012. Plaintiff did not take an appeal from that judgment as he still had pending claims against the police defendants. Thus, this Court did not have jurisdiction to hear an appeal from the September 29, 2012, judgment because it was not a final judgment (see, Finality—Jurisdictional Nature, 15A Fed. Prac. & Proc. Juris. §3905 (2d ed.); 28 USCA. §1291).

Bermudez's malicious prosecution claims because ADA Rodriguez interviewed the witnesses himself and chose to bring charges and draft a complaint and had probable cause for the criminal proceeding (1624).

A final order was entered on March 28, 2014 dismissing the complaint as to "all named defendants" [Dkt. 70] and closed the case. Bermudez filed a notice of appeal on April 14, 2014 (1631).

## ARGUMENT

### POINT I

#### ADA RODRIGUEZ WAS ACTING IN AN INVESTIGATIVE CAPACITY WHEN HE INTERROGATED LOPEZ ON AUGUST 6, 1991

This Court reviews de novo a district court's order granting a Rule 12(b)(6) dismissal motion (Absolute Activist Value Master Fund Ltd. v. Ficeto, 677 F.3d 60, 65 (2d Cir. 2012), and its task is a limited one. The issue is not whether the plaintiff will prevail, but whether he is entitled to offer evidence to support his claims (Scheuer v. Rhodes, 416 US 232, 236 (1974); Patane v. Clark, 508 F.3d 106, 111 (2d Cir. 2007). "[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face" (Ashcroft v. Iqbal, 556 US 662, 678 (2009). Plausibility "is not akin to a probability requirement;" rather, plausibility requires "more than a sheer possibility that a defendant has

acted unlawfully." (Id.; Arista Records, LLC v. Doe 3, 604 F.3d 110, 120–21 (2d Cir. 2010) (rejecting contention that Twombly and Iqbal require the pleading of specific evidence or extra facts beyond what is needed to make the claim plausible).

## A.    Law Regarding Prosecutorial Immunity

A prosecutor is only protected by absolute immunity from liability for damages under §1983 "when performing the traditional functions of an advocate" (Kalina v. Fletcher, 522 US 118, 131 (1997). However, "the actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor" (Buckley v. Fitzsimmons, 509 US 259, 273 (1993). Prosecutorial immunity necessarily depends on "the nature of the function performed, not the identity of the actor who performed it" (Kalina, 522 US 118 at 127, quoting Forrester v. White, 484 US 219, 229 (1988). Prosecutors are entitled to qualified immunity, rather than absolute immunity, when they perform administrative functions, or "investigative functions normally performed by a detective or police officer" (Id. at 126; see, Burns v. Reed, 500 US 478, 494–96 (1991).

The Supreme Court has consistently "emphasized that the official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question" (Burns v. Reed, at 486) and has "refused to extend it any further than its justification would warrant" (Id. at 487

(cits).   To qualify as advocacy, an act must be "intimately associated with the judicial phase of the criminal process" (Imbler v. Pachtman, 424 US 409, 430 (1976); Kalina, at 125; Buckley, at 270; Burns at 479).

The analysis of whether prosecutorial acts constitute advocacy or police-type investigative work is complicated by the fact that the Supreme Court has resisted any attempt to draw a bright-line between the two.   In Buckley the Court noted that "[a] prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested" (509 US at 274).   This might suggest that once probable cause is present, or once an arrest has been made, a prosecutor assumes an advocacy-related role and enjoys absolute immunity.   However, in a footnote appended to the quoted passage, the Court rejected this approach, explaining that "a determination of probable cause does not guarantee a prosecutor absolute immunity for liability for all actions taken afterwards.   Even after that determination...a prosecutor may engage in 'police investigative work' that is entitled to only qualified immunity" (Buckley, at 274 n. 5).

"Witness interviews may serve either an investigative or an advocacy-related function, as may other methods of gathering or manufacturing evidence prior to trial" (Genzler v. Longanbach, 410 F.3d 630, 638 (9th Cir. 2005), citing, KRL v. Moore, 384 F.3d

1105, 1110–16 (9th Cir. 2004) (holding that pre-trial evidence gathering intimately associated with the judicial process was protected by absolute immunity, while evidence gathering for a collateral investigation was not).

When ADA Rodriguez first interviewed Lopez on August 6, 1991, in tandem with Massanova, he was engaged in police-type investigative work, not quasi-judicial advocacy. Moreover, in the amended complaint, Bermudez clearly alleged that at this interview that ADA Rodriguez knew or should have known that Lopez was not telling the truth.[5] Despite the fact that it was apparent that Lopez was lying from the outset, that Bermudez had no demonstrable connection to Lopez or the victim Blount, lived miles away from Lopez's residence, and vehemently professed his innocence, ADA Rodriguez seemingly had no problem prosecuting an innocent man based on a liar's perjured testimony. We submit that having proffered Lopez's testimony, Rodriguez is not entitled to absolute immunity under these circumstances.

The Ninth Circuit's decision in Genzler v. Longanbach, 410 F.3d 630, 639–40 (9th Cir. 2005), is on point and instructive. On April 18, 1996, Genzler stabbed Dustin Harless during a fight. On April 19, Genzler was arrested; after the arrest, ADA Longanbach and Investigator O'Brien were assigned to the case.

---

[5] In his decision vacating the judgment of conviction, Justice Cataldo stated that ADA Rodriguez acknowledged in the 440.10 motion that "Mr. Lopez had actually named the shooter as 'Luis' during his videotaped statement on August 5, 1991."

25

A criminal complaint was filed on April 23, 1996, and Genzler's bail hearing was held on April 29.  Sky Blue Flanders, Harless' fiancé, who witnessed the altercation, was a key witness at Genzler's trial.  On April 26, Flanders met with O'Brien and on April 29, she met with O'Brien and ADA Longanbach.  Although the events she witnessed showed that Genzler acted in self-defense and that she knew that Harless was a skilled street fighter with a violent past, O'Brien and Longback instructed her to lie about what she saw and about Harless' past.

After Genzeler was convicted [6] he commenced an action pursuant to 42 USC 1983 against ADA Longanbach and investigator O'Brien, alleging in relevant part:

> [Longanbach and O'Brien] suborned perjury. Specifically, prior to the preliminary hearing and during the initial investigation of the incident, Longanbach and O'Brien met with Ms. Flanders and told her that in order to secure a conviction she needed to lie about what she saw on the night of the incident and about Mr. Harless' violent past.

The prosecutor and investigator moved for summary judgment on the ground that they were entitled to absolute immunity. However, the district court denied their motions, and the Ninth Circuit affirmed, finding "this claim to state that as part of the initial investigation Longanbach and O'Brien coerced or encouraged Flanders to lie" (Id., at 638).

---

[6] He was actually tried two times; the first conviction was reversed on the ground that the trial judge had improperly recused his attorney.

26

Longanbach and O'Brien relied on the timing of their meetings with Flanders to argue that they were entitled to absolute immunity. They pointed out that their meetings with Flanders occurred after Genzler's April 19 arrest, which Genzler conceded was based on probable cause[7].

The Ninth Circuit did not find these factors dispositive, stating:

> ...in <u>Buckley</u>, the Court was careful to state that "<u>a determination of probable cause does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards</u>. Even after that determination...a prosecutor may engage in 'police investigative work' that is entitled to only qualified immunity." (cite). While interviews conducted before probable cause to arrest has been established are not protected by absolute immunity, the converse is not necessarily true. As the district court correctly observed, the courts have only "draw[n] the line in the reverse, stating that absolute immunity could not be invoked before probable cause was established." Indeed, in <u>Robichaud v. Ronan</u>...we held that prosecutors who, soon after the arrest of a suspect, directed police to coerce a confession from that suspect were not entitled to absolute immunity because their activity was more police-like than prosecutorial.
>
> Timing is thus a relevant, but not necessarily determinative, factor...We also focus on whether the character of the meetings was more in the nature of quasi-judicial advocacy or police-type investigative work.

In the case at bar, ADA Rodriguez, on August 6, 1991, two days after the shooting, conducted custodial interrogations of Bermudez and Lopez and tried to get them to testify against each

---

[7] This was the same flawed reasoning Judge Preska utilized in dismissing the claim against ADA Rodriguez.

other.    That day, Rodriguez and Massanova questioned Lopez extensively about his knowledge of the shooter, who Lopez referred to as "Wool Lou".  A cursory review of the transcript (858–933) shows that ADA Rodriguez was not merely evaluating evidence that was spoon fed to him by the police.  Rodriguez and Massanova were continuing the process of investigating Blount's murder, and the precise charges on which Bermudez would stand trial had yet to be determined (see, Genzler v. Longanbach, at 642 ("On April 29, officials were continuing the process of investigation into the facts that would inform whether there was such probable cause, and the precise charges on which Genzler would stand trial had yet to be determined").

The district court's holding that the plaintiff did not "allege with sufficient particularity that Rodriguez's interactions with identifying witnesses, notably Lopez, occurred outside the scope of his prosecutorial role as an advocate" on August 6 is clearly erroneous (1593).  Paragraphs 86–99 of the amended complaint describe the interrogation Rodriguez conducted in tandem with Massanova.

The amended complaint clearly alleged that "[a]s a result of this interview with Lopez, the following facts became clear: 'a. the shooter's name was Lou, not Fernando; b. Wool Lou was a personal friend of Lopez; c. the shooter had no facial hair; d. the shooter was a regular in Lopez's neighborhood; e. the

28

shooter was a drug dealer at the West 92nd Street playground; and

f. there were many avenues available to the police to determine the identify or existence of Lou" (17.21).

Even if there was some ambiguity on the question of whether ADA Rodriquez and Det. Massanova were merely reviewing and evaluating evidence on August 6, the court had to resolve all ambiguity in favor of Bermudez, the non-moving party (Genzler v. Longanbach, at 642).

There was no ambiguity as the transcript of the videotaped interview of Lopez speaks for itself, and establishes in no uncertain terms that ADA Rodriquez and Det. Massanova were engaged in police-type investigative work on August 6. This is further supported by the fact that after questioning Lopez, ADA Rodriquez and Det. Massanova conducted lengthy interviews with Leonard Macaluso and Euclides Santana, who had been at the Sixth Precinct all day, undergoing extensive questioning.

It is well established that "prosecutorial immunity [is] inapplicable" to "[p]rosecutorial conduct relating to witness interviews" (2 Nahmod, Civil Rights & Civil Liberties Litigation: The Law of Section 1983 §7:50).

In Kulwicki v. Dawson, 969 F.2d 1454 (3d Cir. 1992), the Third Circuit in affirming the district court's denial of summary judgment for the defendant prosecutors in connection with witness interviews, noted that although "the line between

quasi-judicial and investigative activity is far from clear,"
some courts "look to the occurrence of the activity relative to
the filing of the complaint.  Evidence gleaned prior to the
filing is deemed investigative...[while] [e]vidence obtained at
or after the filing is likely to be connected with an existing
prosecution, and is absolutely protected."

The Third Circuit found that the complaint on its face
suggested investigation rather than prosecution, and thus, even
though facts might later be developed to challenge this
characterization, at that juncture, absolute immunity was
unavailable.  While the complaint in this case clearly alleged
investigation as opposed to prosecution, on this record, there
is no question that two days after the murder, ADA Rodriguez was
in engaged in investigation, not prosecution (see, Manetta v.
Macomb County Enforcement Team, 141 F.3d 270 (6th Cir. 1998)
(prosecutorial immunity inapplicable to a prosecutor's actions
in connection with the preliminary investigation of the
plaintiffs and his decision to order them held on extortion
charges).

In Simon v. City of New York, 727 F.3d 167 (2d Cir. 2013),
cert. denied, 134 S. Ct. 1934 [2014], this Court noted that "[a]
prosecutor cannot receive absolute immunity for investigative
work merely because the work may later "be retrospectively
described as 'preparation' for a judicial proceeding".  "As the

Supreme Court has pointed out, '[a]lmost any action by a prosecutor, including his or her direct participation in purely investigative activity, could be said to be in some way related to the ultimate decision whether to prosecute," but absolute immunity is not so expansive'" (Id., at 173–74).

It is true that "[t]he prosecutorial function may encompass questioning a witness for a brief period before presentation to determine whether, in the prosecutor's judgment, the witness's testimony should still be pursued or whether the witness should be released without further action" (Simon at 173). However, the complaint and the transcript of Lopez's videotape interview, during which Lopez was read his Miranda rights, clearly showed that his detention and interrogation went far "beyond what could reasonably be construed as clarifying [his] status or 'preparing' [him] for a grand jury appearance, and became an investigative interview" (Id.). At the end of the interview, Lopez was free to leave[8]; that he could "eventually have been called to testify in a judicial proceeding" did not make the interview "a prosecutorial function" (Id).

It must be reiterated that from August 5 to August 6, 1991, Lopez, who was just 16 years old, was held against his will for almost 30 hours. When Lopez was initially picked up on August 5, he was taken to the Sixth Precinct, was "Mirandized" and

---

[8] Lopez would later sign a cooperation agreement wherein he was granted immunity in exchange for his testimony at trial.

questioned for hours, mainly by Det. Massonova and Det. Mulalley (17.14).

When Rodriguez questioned Lopez, he read him his <u>Miranda</u> rights, confirming that it was a custodial interrogation. This Court has consistently held that arrest and detention are classic "police functions," and as such, they are covered by qualified, not absolute, immunity (<u>Robison v. Via</u>, 821 F.2d 913, 918 (2d. Cir. 1987); <u>Cornejo v. Bell</u>, 592 F.3d 121, 128 (2d Cir. 2010); <u>Day v. Morgenthau</u>, 909 F.2d 75, 77–78 (2d Cir. 1990); <u>Barr v. Abrams</u>, 810 F.2d 358, 362 (2d Cir. 1987); cf. <u>Burns v. Reed</u>, 500 US 478, 492–96 (1991) (prosecutor did not have absolute immunity for advising police officers to arrest a suspect).

Arrest and detention are not advocative acts and "do not become prosecutorial functions merely because a prosecutor has chosen to participate" (<u>Robison</u>, 821 F.2d at 918). Rather, if prosecutors choose to get involved in arresting and detaining someone, they are entitled to the same degree of immunity that police officers enjoy––no more, and no less (<u>Buckley</u>, 509 US at 273 ("When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other.") (cits.).

The district court's logic abandoned the longstanding rule that classic police functions are subject to qualified immunity, and that prosecutors are entitled to absolute immunity only if they can show that an arrest or detention is reasonably related to the prosecutor's ultimate advocacy duties. As the Supreme Court has explained, "[a]lmost any action by a prosecutor, including his or her direct participation in purely investigative activity, could be said to be in some way related to the ultimate decision whether to prosecute, but we have never indicated that absolute immunity is that expansive" (Burns, 500 US at 495).

Moreover, the rule that arrests and detentions are subject to qualified, not absolute, immunity remains true even when judicial proceedings are imminent or underway (See, e.g., Day, 909 F.2d at 76 (arrestee was charged with criminal trespass); Barr, 810 F.2d at 360 (arrestee had been charged with criminal contempt). The act of arresting and detaining remains a police function.

It must be emphasized that two hours prior to conducting Lopez's custodial interrogation, ADA Rodriguez and Det. Massanova conducted a video-taped interrogation of Bermudez. ADA Rodriguez told Bermudez that "Shorty," or "Efrain Lopez," had identified him and tried to get Bermudez to inculpate Lopez by saying that if he did not do so, Bermudez would be the only

33

person punished for a homicide for which "Shorty" was largely to blame (amended complaint at ¶86-87).

"The Supreme Court's decision in <u>Buckley</u> instructs that it is necessary to pay close attention to the particular time frame of the contested prosecutorial actions in evaluating whether those actions are part of the advocacy or the investigatory function" (Sec. 1983 Litig. Claims & Defenses §9.05 Prosecutorial Immunity, Schwartz).

There should be no question on this record that ADA Rodriguez's functions were that of an investigator on August 6. It was two days after the shooting, the case was still in the investigatory stage and ADA Rodriguez took a "hands on" approach to questioning Lopez, questioning Bermudez and questioning the identification witnesses. The interrogation of Lopez, who was also a suspect on August 6, was custodial and intended to gain information, not merely evaluate it. "Giving Miranda warnings and participating in the interrogation of a suspect" is a "non-advocacy function[]...not governed by absolute prosecutorial immunity" (Sec. 1983 Litig. §9.05, citing, <u>Rex v. Teeples</u>, 753 F.2d 840 (10th Cir. 1985), <u>cert. denied</u>, 474 US 967).

As this Court held in <u>Simon</u> "[p]olice officers and a prosecutor who engage in extended detention and interrogation—including requiring attendance for a second full day—of a material witness...are, as a matter of law, engaged in an

34

investigative function that entitles them to, at most, qualified immunity" (Simon v. City of New York, at 174).

However, under these circumstances, ADA Rodriguez is not even entitled to qualified immunity.

### POINT II

**ADA RODRIGUEZ IS NOT PROTECTED BY PROSECUTORIAL IMMUNITY WHEN HE KNEW OR HAD REASON TO KNOW THAT LOPEZ WAS NOT TELLING THE TRUTH WHEN HE INTERROGATED HIM ON AUGUST 6, 1991**

In his order dated November 9, 2009, which vacated Bermudez's conviction, Justice Cataldo held that ADA Rodriguez "knew, or should have known, that Mr. Lopez's testimony was false prior to the entry of judgment" (689). The court stated that:

> [it took] into consideration the sworn habeas corpus testimony of ADA. Rodriguez, that as far back as 1992, before entry of judgment, he surmised that Efraim Lopez had lied when he testified the defendant was Wool Lou. I find this testimony alone demonstrates the People knew of the existence of Mr. Lopez's materially false testimony prior to the entry of judgment.

> However, even without this testimony, I find the evidence demonstrates that the People knew, or should have known, that Mr. Lopez's testimony was false prior to the entry of judgment (689).

In fact, while Lopez identified Bermudez as "Wool Lou" to ADA Rodriguez on August 6, 1991, at the videotaped interrogation (894-95), Justice Cataldo found that "Mr. Lopez had actually named the shooter as "Luis" during his videotaped statement...and that "[t]hese repeated references to Lou as the

shooter's name, and even a reference to the name Luis, posed a dilemma for the prosecution of a man named Fernando with a nickname of 'Most.'  This dilemma was never placed before the jury" (683).

Justice Cataldo then noted that ADA Rodriguez "went so far as to elicit from Mr. Lopez, without correction or further inquiry, the following testimony:

> Q: Mr. Lopez, on August 19[sic], 1991 did you know someone named Woolu?
> A: Yes.
> Q: Do you know his real name?
> A: No.

(689).

Justice Cataldo held that ADA Rodriguez "had a duty to correct this testimony as he was aware that Mr. Lopez had previously stated the shooter's name was Lou and Luis. As noted in People v. Savvides, 1 NY2d 554, 557 (1956): 'A lie is a lie, no matter what its subject and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth.'  The failure to correct false or mistaken material testimony of a prosecution witness is a violation of a defendant's right to due process of the law" (Id, citing People v. Bournes, 60 AD3d 687 (2d Dept. 2008).

ADA Rodriguez is "not entitled to absolute immunity if one accepts as true the allegations that [he] knowingly obtained

false statements from [Lopez] for the purpose of prosecuting [Bermudez]" (Milstein v. Cooley, 257 F.3d 1004, 1011 (9th Cir. 2001). "It follows, then, that acquiring known false statements from a witness for use in a prosecution is likewise fabricating evidence that is unprotected by absolute immunity" (Id., citing Buckley, 509 US at 276).

The Supreme Court and this Court have held that prosecutors are not protected by absolute immunity for fabricating evidence if they acted in an investigatory role (see, Buckley, 509 US at 275) (finding that absolute immunity did not protect prosecutors when "[i]t was well after the alleged fabrication of false evidence concerning the boot print that a special grand jury was impaneled," noting that the prosecutors' alleged fabrication "occurred well before they could properly claim to be acting as advocates"); Hill v. City of New York 45 F.3d 653, 662 (2d Cir. 1995) ("[Absolute] immunity does not protect efforts to manufacture evidence that occur during the investigatory phase of a criminal case").

For instance, in Zahrey, this Court held "that there is a constitutional right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigatory capacity, at least where the officer foresees that he himself will use the evidence with a resulting deprivation of liberty" 221 F.3d at 344; accord McGhee v.

Pottawattamie County, 547 F.3d 922, 933 (8th Cir. 2008); <u>Milstein</u>
<u>v. Cooley</u>, 257 F.3d 1004, 1006, 1011 (9th Cir. 2001).

In <u>Fields v. Wharrie</u>, 740 F.3d 1107 (7th Cir. 2014), the
Seventh Circuit held that in a tort action brought by a former
prisoner who was wrongfully convicted of murder, a prosecutor
did not have absolute immunity under Illinois law for his pre-
prosecution fabrication of evidence as an investigator, and his
later introduction of the fabricated evidence at trial.

We respectfully submit that the same result should be
reached in this case. Justice Cataldo observed "From the first
time that ADA Rodriguez interviewed Efraim Lopez on August 5,
1991, he was aware that Mr. Lopez knew the shooter's name was
Lou or Luis". However, at trial, neither Rodriguez nor Lopez
ever referred to the shooter as Lou. Moreover, as noted above,
Rodriguez knowingly elicited false testimony from Lopez when he
when Lopez denied knowing what the "Lu" in Woolu's meant. To
reiterate, Lopez told Rodriguez that the shooter's name was Lou
or Luis. This support's the allegations in the amended
complaint that Rodriguez knew that Lopez was lying when he
interrogated him and used this materially false evidence at
trial to support plaintiff's conviction (at ¶¶ 215, 217).

"A prosecutor who manufactures evidence when acting in an
investigatory role can cause a due process violation just as
easily as a police officer. The fact that the prosecutor who

38

introduces the evidence at trial cannot be liable for the act of introduction, whether it is the same prosecutor who fabricated the evidence or a different prosecutor, is beside the point. It would be incongruous to hold a police officer liable for fabricating evidence but hold that the prosecutor has not committed any violation for taking the same action in the same capacity. In fact, the whole point of the Supreme Court's rule in Buckley is that "the police and investigating prosecutors are subject to the same constraints" (Whitlock v. Brueggemann, 682 F.3d 567, 580-81 (7th Cir. 2012), cert. denied, 133 S. Ct. 981.

Contrary to what ADA Rodriguez argued below, "a prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as 'preparation' for a possible trial; every prosecutor might then shield himself from liability for any constitutional wrong against innocent citizens by ensuring that they go to trial" (Buckley v. Fitzsimmons, at 275-76; see also, Zahrey v. Coffey, 221 F.3d 342, 349, 354 (2d Cir. 2000); McGhee v. Pottawattamie County, 547 F.3d 922, 932-33 (8th Cir. 2008); Moore v. Valder, 65 F.3d 189, 194-95 (DC Cir. 1995).

A prosecutor cannot retroactively immunize himself from conduct by perfecting his wrong-doing through the introduction of fabricated evidence at trial and arguing that the misconduct

was not completed until a time at which he had acquired absolute immunity.   That would create a "license to lawless conduct," which the Supreme Court has said is not protected by the invocation of qualified immunity, (Harlow v. Fitzgerald, 457 US 800, 819 (1982).

In Whitlock v. Brueggemann, supra, the Court, in reaching the conclusion that the prosecutor was not entitled to qualified immunity for fabricating evidence, relied on principles of causation, a standard element of tort liability (682 F.3d at 582-83).  "Section 1983 imposes liability on every official who 'subjects, or *causes to be subjected*, any citizen...the deprivation of any rights...secured by the Constitution and laws.'"  *Id.* at 582 (emphasis in original); 42 USC §1983.  The Court stated that fabricated evidence that is later used to deprive someone of liberty can be both a but-for and proximate cause of the due process violation (Whitlock, 682 F.3d at 583; see also, Jones v. City of Chicago, 856 F.2d 985, 994 (7th Cir. 1993).

"That a prosecutor has absolute immunity for conduct taken in his advocacy role is besides the point...a prosecutor whose investigatory conduct is the proximate cause of the due process violation that occurs when false evidence is introduced at trial is held to the same standard of liability as a police officer who does the same thing" (Whitlock, 682 F.3d at 583).  Thus,

40

because the prosecutor in <u>Whitlock</u> fabricated evidence during the investigatory phase, and there was no intervening cause of the constitutional violation (use of the evidence at trial), the prosecutor was not entitled to qualified immunity (<u>Id.</u> at 584).

We anticipate that ADA Rodriguez will argue that he did not coerce Lopez and thus was not guilty of a constitutional violation. If raised, this argument must be rejected. "[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice" (<u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 127 S.Ct. 2499, 2509 (2007); 5B Fed. Prac. & Proc. Civ. §1357 (3d ed.).

Moreover, Justice Cataldo held in vacating the judgment of conviction that ADA Rodriguez knew or should have known that Lopez was lying when he testified at trial that he did not know what "Lu" meant and did not know "Woolu"'s real name. Rodriguez admitted that he surmised that Lopez was lying when he testified Bermudez was "Wool Lou". Given that Lopez identified the Bermudez as "Wool Lou" to ADA Rodriguez two days after the shooting, that ADA Rodriguez permitted Lopez to lie at trial without correcting his testimony and because Lopez's testimony at trial that Bermudez was the shooter was the proverbial

"smoking gun" that sealed Bermudez's fate, ADA Rodriguez is not entitled to absolute immunity.

In addition, given Justice Cataldo's findings, we submit that under the doctrine of offensive collateral estoppel, ADA Rodriguez is not even entitled to qualified immunity (see, Sec. 1983 Litig. Claims & Defenses §11.15 Offensive Collateral Estoppel, citing, inter alia, 28 USC. §1738 <u>Benjamin v. Coughlin</u>, 905 F.2d 571 (2d Cir. 1989).

There is no dispute that Bermudez spent 18 years in a maximum security prison for a crime he did not commit. As ADA Rodriguez ruined Bermudez's life by prosecuting him with testimony he knew (or should have known was false), dismissing Bermudez's complaint is truly a travesty of justice.

## POINT III

**THE COMPLAINT SHOULD BE REINSTATED AGAINST THE POLICE DEFENDANTS**

The Court reviews de novo the granting of summary judgment by a district court (<u>Pepsico, Inc. v. Coca-Cola Co.</u>, 315 F.3d 101, 104 (2d Cir. 2002). Summary judgment is appropriate only where, "[e]xamining the evidence in the light most favorable to the nonmoving party," <u>Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.</u>, 145 F.3d 543, 547 (2d Cir. 1998), the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law," Fed.R.Civ.P. 56(c).

A motion for summary judgment must be rejected "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party" (<u>Anderson v. Liberty Lobby, Inc.</u>, 477 US 242, 248 (1986). The party against whom summary judgment is sought "must do more than simply show that there is some metaphysical doubt as to the material facts.... The nonmoving party must come forward with specific facts showing that there is a genuine issue for trial" (<u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 US 574, 586–87, (1986) (internal quotation marks omitted).

"When a police officer creates false information likely to influence a prosecutor's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 USC §1983" (<u>Ricciuti v. New York City Transit Auth.</u>, 124 F.3d 123, 130 (2d Cir. 1997) (cits.). The right to a fair trial is violated when an officer "creates false information likely to influence a jury's decision and forwards that information to prosecutors." (<u>Id</u>).

Police officers who procure "false identification by unlawful means and deliberately conceal exculpatory evidence violates clearly established constitutional rights" (Sec. 1983 Litig. Claims & Defenses §3.23A Schwartz, citing <u>Geter v.</u>

43

Fortenberry, 849 F.2d 1550 (5th Cir. 1988); see, Good v. Curtis, 601 F.3d 393, 398 (5th Cir. 2010) (police officer's intentional manipulation of photo lineup in order to produce false identification from eyewitness violated due process).

"Identification procedures conducted during the investigation of a criminal case must conform to standards of fundamental fairness. An identification violates the requirements of due process of law if it was obtained in a manner so impermissibly suggestive as to give rise to substantial likelihood of mistaken identification" (Police Misconduct: Law and Litigation §12:28, Obtaining identifications through suggestive methods).

"If a defendant obtained an identification of a plaintiff in an impermissible suggestive manner" he or she may be held "liable for manufacturing evidence" (Id., citing, Kirby v. Illinois, 406 US 682, 690-692 (1972); Simmons v. US, 390 US 377 (1968); Newsome v. McCabe, 319 F.3d 301 (7th Cir. 2003).

Police officers who solicit a witness to commit perjury may be held liable under Section 1983. (Whitlock, 682 F.3d at 583; see also, Parratt v. Taylor, 451 US 527, 535 (1981); Fields, 740 F.3d at 1109.

## A.    Probable Cause

The trial court's determination that defendants "had probable cause to arrest Bermudez in connection with the Blount

homicide" was based an erroneous reading of the record. Specifically, the court held that defendants had probable cause to arrest Bermudez because "[a]t the time of his arrest, five eyewitnesses had identified Bermudez as either the shooter or having been present at the scene and approached Blount with a gun prior to the shooting" (1622). We respectfully submit that this finding was incorrect. All of the witnesses informed the police that they did not think that Bermudez was the shooter.

With regard to Lopez, he stated in his affidavit that he never saw Bermudez in the Marc Ballroom on August 3 to August 4, 1991, and that he "had never seen him before in [his] life". However, Det. Massanova told him that Bermudez was a drug dealer and that if he did not identify him as the shooter, Lopez would be prosecuted for the shooting.

Jamie Velasquez stated that when she was at the police station after the shooting she "kept telling anyone who would listen that I did not see the actual shooting of Raymond Blount" (599).

Likewise, Frank Kent stated "I never made a positive identification of the shooter. I never saw the shooting...I never even knew Raymond got shot until several hours later" (602).

In his affidavit Okpa Iyesi stated "on August 6, 1991 I saw the defendant sitting down in a line-up. At no time did he get

45

up.  I also told the detectives that I didn't believe he was the shooter, because the shooter was built like me –– about 150 –160 pounds and about 5'9" or 5'10", tops" (605–6).

In his affidavit, Michael Thompson affirmed "I never saw the defendant in my life before I saw him the lineup.  I made an honest mistake.  Also, I tried to tell the ADA and the police that I wasn't sure, but they didn't want to hear it" (609).

We respectfully submit that as each of these witnesses never positively identified Bermudez as the shooter, the element of probable cause was lacking and the police defendants are not entitled to summary judgment on the issue of qualified immunity.

In Manganiello v. City of New York, 612 F.3d 149 (2d Cir. 2010), this Court upheld a jury's verdict finding the defendant detective liable for malicious prosecution.[9]  The defendant argued that he should have been granted judgment as a matter of law because probable cause existed, or should be presumed to have existed by virtue of a grand jury indictment of the plaintiff for murder. Rejecting the argument, this Court observed that the presumption of probable cause from a grand jury indictment could be rebutted by evidence that the indictment was procured by fraud, perjury or the suppression of evidence by the police officer.

---

[9] The plaintiff in Manganiello was prosecuted for murder and acquitted.

There was ample evidence to support the jury's findings that the defendant engaged in at least one of these kinds of misconduct: the defendant refrained from making inquiries into other possible suspects, ignored evidence that the plaintiff was not guilty, declined to inform the prosecutor of possibly exculpatory evidence, secured an inculpatory statement from a witness by promising not to disclose that witness's known criminal activities and included in some of his own reports statements adverse to the plaintiff that were contradicted by persons with first-hand knowledge of the facts. Furthermore, it was clear that the defendant caused the initiation or continuation of the criminal proceedings against the plaintiff. Finally, there was sufficient evidence of malice in the sense that the defendant acted with "something other than a desire to see the ends of justice served." (612 F.3d at 164).

The facts in this case are just as egregious. Det. Massanova threated to prosecute Lopez if he didn't falsely identify Bermudez as the shooter and each of the four identification witnesses never made a positive identification. Their identifications were not only suggestive; they were fabricated and coerced.

We respectfully submit that there is sufficient evidence showing that the police defendants lied in order to secure an indictment. Thus the probable cause issue could not be resolved

47

on summary judgment (see, <u>Boyd v. City of New York</u>, 336 F.3d 72, 75 (2d Cir. 2003) (cit.).

**B.    Suggestive Identifications; Coerced Testimony**

The United States Department of Justice has issued a set of standardized, suggested instructions that all law enforcement officers should follow in conducting photo array lineups:

> (1) it is just as important to clear an innocent person from suspicion as to identify a guilty party; (2) the person who had committed the crimes might or might not be in the photographic array; and (3) the police would continue their investigation regardless whether the witness makes an identification (Eyewitness Identification: Legal & Practical Problems 2d §5:11, quoting United States Department of Justice, Eyewitness Evidence: A Guide for Law Enforcement).

As Justice Cataldo held, and as the US Supreme Court has confirmed, Bermudez had a due process right not to be identified prior to trial in a manner that is "unnecessarily suggestive and conducive to irreparable mistaken identification" (<u>Stovall v. Denno</u>, 388 US 293, 301-02 (1967), overruled on other grounds by <u>Griffith v. Kentucky</u>, 479 US 314 (1987). "The influence of improper suggestion upon identifying witnesses probably accounts for more miscarriages of justice than any other factor -- perhaps it is responsible for more such errors than all other factors combined" (<u>People v. Riley</u>, 70 NY2d 523, 529 (1987), quoting <u>US v. Wade</u>, 388 US 218, 229 (1967).

Suggestive lineups are particularly dangerous because they can taint later proceedings: "Regardless of how the initial

misidentification comes about, the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification" (<u>Simmons</u>, 390 US at 383–84). This is exactly what happened here. "A major factor contributing to the high incidence of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification" (<u>Wade</u>, 388 US at 228).

According to the jury instructions for obtaining identifications through suggestive methods:

> Identification procedures conducted during the investigation of a criminal case must conform to standards of fundamental fairness. An identification violates the requirements of due process of law if it was obtained in a manner so impermissibly suggestive as to give rise to substantial likelihood of mistaken identification.

> Improperly suggestive procedures include coercing a witness to identify a particular suspect and displaying photos in a manner that suggests an officer desires the witness to select a particular photo. If a defendant obtained an identification of a plaintiff in an impermissible suggestive manner, you may hold the defendant liable for manufacturing evidence (Police Misconduct: Law and Litigation §12:28, Jury Instructions.

## C. The Chain Of Causation Was Not Broken

The district court erred in holding that "ADA Rodriguez broke the chain of causation between the Officer Defendants and

49

Plaintiff's conviction..." because he "interviewed all of the witnesses who had viewed the identification lineup..." ADA Rodriguez was never informed about the police's outrageous conduct. It is uncontested on this record that Rodriguez was never informed about the unduly suggestive identification procedures that were used.

"[I]n malicious prosecution actions alleging that a police officer provided false information to a prosecutor, what prosecutors do subsequently has no effect whatsoever on the police officer's initial, potentially tortious behavior" (Cameron v. City of New York, 598 F.3d 50, 63-64 (2d Cir. 2010), citing, Higazy v. Templeton, 505 F.3d 161, 177 (2d Cir. 2007) ("[T]he chain of causation need not be considered broken if [a defendant government agent] deceived the subsequent decision maker or could reasonably foresee that his misconduct [would] contribute to an independent decision that results in a deprivation of liberty." (cits.); Zahrey v. Coffey, 221 F.3d 342, 352 (2d Cir. 2000) ("Even if the intervening decision-maker (such as a prosecutor, grand jury, or judge) is not misled or coerced, it is not readily apparent why the chain of causation should be considered broken where the initial wrongdoer can reasonably foresee that his misconduct will contribute to an 'independent' decision that results in a deprivation of liberty.").

Thus, it cannot be said as a matter of law that these egregious violations played no part in ADA Rodriguez's decision to prosecute Bermudez. The fact that he also interviewed the eyewitnesses did not sever the causal chain. While the witnesses may have expressed uncertainty about Bermudez's identity, most courts "have concluded that such uncertainty is significant in determining that the witness has not retained the image of the perpetrator since commission of the crime" (Eyewitness Identification: Legal & Practical Problems 2d §6:12, citing US v. Cueto, 611 F.2d 1056, 1064 (5th Cir. 1980); US v. Sanders, 479 F.2d 1193 (D.C. Cir. 1973); Roe v. People of State of N.Y., 363 F.Supp. 788 (WDNY 1973), judgment aff'd, 495 F2d 764 (2d Cir. 1974).

When ADA Rodriguez met with the witnesses after the lineup procedure he did not know about the suggestive lineups and the threats Massanova made to Lopez to falsely identify Bermudez as the shooter. In Solomon v. Smith, 487 F.Supp. 1134, 1136 (SDNY 1980), judgment aff'd, 645 F.2d 1179 (2d Cir. 1981), the district court, in granting habeas corpus relief, pointed out that the inability of the witness to understand the dangers of eyewitness identification can lead to a very credible performance before the jury:

> [T]he key State identification witness undoubtedly believed that her identification of petitioner as the criminal was accurate. She could not be expected to

understand the subtle impact which investigative suggestiveness might play in translating a tentative identification into a positive one. Nor could she be expected to understand the psychological process by which an uncounseled showup on the heels of investigative suggestiveness could substitute the image of the petitioner for that of the gunman. Her testimony undoubtedly impressed the jury as being honest and believable, and one would expect a jury hearing that testimony to return a verdict of guilty.

This is exactly what occurred here. As Justice Cataldo noted "Mr. Bermudez was identified by four young eyewitnesses who sat together and discussed his photograph". While Det. Fitzpatrick stated "that overseeing the viewing was like proctoring an examination" (CPL 440 Tr. 568), Justice Cataldo observed that:

> "The purpose of proctoring students during a test is to watch for cheating. These young witnesses, not understanding the import of their behavior, did just that, they cheated and discussed [Bermudez's] photograph amongst themselves, before Det. Lentini returned to the room"

                    *   *   *

Together, they all decided the defendant resembled the shooter. Before long, he became the shooter.

In addition, there is no evidence that ADA Rodriguez was aware of the egregious misconduct the officers engaged in. Before ADA Rodriguez interrogated Lopez, Det. Massanova threatened Lopez that if he didn't identify Bermudez as the shooter, he would be charged as the shooter. In addition, when Michael Thompson was arrested on the material witness order, the

police, who did not have a warrant or probable cause, searched his bedroom and found a toy gun.  They threatened that if Thompson did not testify against Bermudez they knew that "this gun is used in robberies" (1131).

It cannot be said as a matter of law that the unduly suggestive identifications and the threats used against witnesses had no bearing on ADA Rodriguez's decision to prosecute Bermudez.

The district court's reasoning "hardly furthers the remedial purpose of the statute, inasmuch as prosecutors...enjoy absolute immunity from damages for actions taken pursuant to their duties connected with trials" (Obstacles to Litigating Civil Claims for Wrongful Conviction: An Overview, 18 B.U. Pub. Int. L.J. 439, 450 (2009), citing, Imbler v. Pachtman, 424 US 409 (1976).  "Moreover, it suggests that a police officer is free to run about like a bull in a china shop, violating the rights of suspects throughout an investigation, but incurring no liability due to subsequent decisions by other actors in the criminal justice system.  Such an argument does not further the deterrent purpose of the constitutional tort remedy provided by §1983" (Id).

**D.  Qualified Immunity**

"Qualified immunity shields law enforcement officers from § 1983 claims for money damages provided that their conduct does

not violate clearly established constitutional rights of which a reasonable person would have been aware" (Savino v. Town of Se., 2014 WL 3036081 (2d Cir. July 7, 2014), quoting, Zalaski v. City of Hartford, 723 F.3d 382, 388 (2d Cir. 2013). "The qualified immunity test is an objective one" (Id., quoting Zellner v. Summerlin, 494 F.3d 344, 367 (2d Cir. 2007). The issue is whether "the facts, viewed in the light most favorable to the plaintiff, show that the officer's conduct violated a constitutional right," and, if so, "[w]as the right at issue clearly established at the time of the defendant's actions?" (Id., quoting Walczyk v. Rio, 496 F.3d 139, 154 (2d Cir. 2007).

Case law clearly establishes that identifications of suspects obtained by the police using highly unreliable photo arrays cannot be the sole basis for probable cause (see, Gregory v. City of Louisville, 444 F.3d 725, 743-46 (6th Cir. 2006); Stansbury v. Wertman, 721 F.3d 84, 90-91 (2d Cir. 2013). The Supreme Court has long held that, when evaluating whether a pretrial photographic lineup is unduly suggestive, "each case must be considered on its own facts," and "convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification" (Simmons v. United

54

States, 390 US 377, 384 (1968) (construing a due process claim); see also, Perry v. New Hampshire, 132 S.Ct. 716, 726 (2012); Neil v. Biggers, 409 US 188, 197 (1972).

Though Simmons, Perry, and Neil considered suggestiveness in deciding whether lineups were admissible at trial, these and similar cases instruct police officers about the constitutional parameters they must obey to ensure that a photo array shown to an eyewitness does not taint the identification process. Because of this longstanding law, an objectively reasonable police officer would have been on notice long before Bermudez's arrest that a photographic lineup shown to eyewitnesses for the purpose of developing probable cause may not be "impermissibly suggestive" as defined by the Supreme Court nor may identifications resulting from such a lineup serve as the sole basis for probable cause.

In Jones v. City of Chicago, 856 F.2d 985 (7th Cir. 1988), the plaintiff was falsely accused and prosecuted for rape and murder. During the course of the investigation the police officers made an arrest without probable cause, supplied false information to prosecuting authorities, "buried" exculpatory information in "street files" which were not furnished to prosecuting authorities, relied upon obviously inadequate identification procedures, and committed various other wrongs.

The facts in this case are equally if not more egregious. Thus, under these circumstances, we respectfully submit that probable cause did not exist for the arrest and prosecution of Bermudez.

## E.  Malicious prosecution

"Because there are no federal rules of decision for adjudicating §1983 actions that are based upon claims of malicious prosecution, [courts] are required by 42 USC §1988 to turn to state law—in this case, New York state law—for such rules."  (Conway v. Vill. of Mount Kisco, NY, 750 F.2d 205, 214 (2d Cir. 1984).  To obtain recovery for malicious prosecution, a plaintiff must establish that a criminal proceeding was commenced, that it was terminated in favor of the accused, that it lacked probable cause, and that the proceeding was brought out of actual malice (see, Martinez v City of Schenectady, 97 NY2d 78, 85 [2001]).

As it pertains to malicious prosecutions, "even when probable cause is present at the time of arrest, evidence could later surface which would eliminate that probable cause....  In order for probable cause to dissipate, the groundless nature of the charges must be made apparent by the discovery of some intervening fact....  The New York Court of Appeals has noted that the failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable

cause" (<u>Lowth v. Town of Cheektowaga</u>, 82 F.3d 563, 571 (2d Cir. 1996) (cits.); see, <u>Korthas v. City of Auburn</u>, 2006 WL 1650709, at *15 (NDNY June 9, 2006).

Here there was no probable cause to prosecute Bermudez. The witnesses never made a positive identification and the indictment and prosecution were obtained through coerced testimony and unduly suggestive identifications.  There was no evidence that ADA Rodriguez knew Det. Massanova told Lopez that if he didn't identify Bermudez through a photograph he was handed, he would be prosecuted as the shooter, that Thompson was threated to be prosecuted for uncharged robberies if he didn't testify against Bermudez or that the lineups were unduly tainted.  As all of the witnesses recanted their identification testimony; probable cause was clearly lacking.

"The 'actual malice' element of a malicious prosecution action does not require a plaintiff to prove that the defendant was motivated by spite or hatred, although it will of course be satisfied by such proof.  Rather, it means that the defendant must have commenced the prior criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served" (<u>Nardelli v. Stamberg</u>, 44 NY2d 500, 503 [1978]).

"The act may have been done with an intent to inflict injury, or, malice may be inferred if the defendant has acted

with a "wanton, reckless or grossly negligent disregard of the plaintiff's rights, inconsistent with good faith. Malice may also be inferred from a finding that the defendant lacked probable cause in bringing the prior prosecution" (<u>Jestic v. Long Island Sav. Bank</u>, 81 AD2d 255, 258 [2d Dept. 1981]).

> Lack of probable cause for the initiation of criminal proceedings, in so far as it tends to show that the accuser did not believe in the guilt of the accused, is evidence that he did not initiate the proceedings for a proper purpose. The circumstances may show so slight a basis for the defendant's belief in the guilt of the accused as to justify the jury in finding that he did not have that belief in the guilt of the accused which is necessary to justify the initiation of criminal proceedings, and, therefore, did not initiate them for their only proper purpose....In other words, probable cause to initiate a criminal proceeding may be so totally lacking as to reasonably permit an inference that the proceeding was maliciously instituted. Hence, a jury may, but is not required to, infer the existence of actual malice from the fact that there was no probable cause to initiate the proceeding" <u>Martin v. City of Albany</u> 42 NY2d 13, 17 [1977], citations omitted).

In addition to the lack of probable cause, coercion of witnesses, orchestrating unduly suggestive identifications, and failure to inform the ADA about this misconduct, no reasonable police officer would have ignored the leads that Lopez provided with regard to the actual shooter.

**(1) Det. Massonava**

At the end of trial and prior to sentencing, Michael Gaynor contacted Det. Massanova and "furnished him with the information he had obtained that Luis Munoz was the real Wool Lou. He

provided Det. Massanova with Luis Munoz's home address, 136 West 91st Street, Apt. 15K.  Det. Massanova affirmatively stated that he would look into the matter" (690).   While Det. Massanova relayed this information to ADA Rodriguez, Rodriguez merely looked up Munoz's criminal history and "made no further efforts to look for Mr. Munoz or investigate his possible involvement in the homicide" (691).

Had ADA Rodriguez been informed that Det. Massanova coerced Lopez into falsely identifying Bermudez, there is an issue of fact as to whether Rodriguez would have pursued this lead, which undeniably would have led him to the actual shooter.

Det. Massanova's motives were willful and malicious.  He wanted Bermudez prosecuted for a murder he didn't commit because he believed he was a drug dealer and undeserving of due process. Det. Massanova believed, as he would later express to Gaynor, "if it ain't for this [Bermudez] was gonna go to jail for something else anyway" (800).

## F.   Brady Claim

"A §1983 Brady claim maybe asserted against a police officer based upon the officer's failure to disclose exculpatory material to the prosecutor'" (Sec. 1983 Litig. Claims & Defenses §3.23A, citing <u>Whitlock</u>, supra; <u>Johnson v. Dossey</u>, 515 F.3d 778, 781 (7th Cir. 2008).

The Supreme Court holds that because the Brady rule encompasses "evidence known only to police investigators and not to the prosecutor," (Kyles v. Whitley, 514 US 419, 435, 438-39 (1995) to comply with Brady the "prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf...including the police"(Strickler v. Greene, 527 US 263, 280-81 (1999). "[U]nlike prosecutors who are absolutely immune from §1983 liability for Brady violations, the liability of police officers sued under §1983 for Brady violations is governed by qualified immunity" (Sec. 1983 Litig. §3.23A, citing Gibson, 411 F.3d at 433; Geter v. Fortenberry, 849 F.2d 1550, 1559-61 (5th Cir. 1988). "Qualified immunity protects an official sued under § 1983 from liability so long as she did not violate clearly established federal law" (Id., citing, Messerschmidt v. Millender, 132 S. Ct. 1235 (2012).

Police officers do not discharge their constitutional obligation under *Brady* by disclosing exculpatory evidence to a prosecutor with whom they are conspiring (see, Whitlock, 682 F.3d at 576. To fulfill their obligations, the police must disclose the evidence to a "competent authority," not a co-conspirator (Id., quoting, Steidl v. Fermon, 494 F.3d 623, 630 (7th Cir. 2007).

Here, the tainted witness identifications and Lopez's coerced testimony was Brady material. The police defendant's failure to disclose this material is actionable as well.

For the foregoing reasons, we submit that the complaint should be reinstated against the police defendants as well.

**CONCLUSION**

Based upon the forgoing, it is respectfully submitted that the district court's final judgment should be reversed in all respects and the complaint reinstated in its entirety.

Respectfully submitted,

THE LAW OFFICE OF
MICHAEL S. LAMONSOFF, PLLC
*Attorneys for Plaintiff-Appellant*


By:   _____s/ Brian J. Isaac_____
      Brian J. Isaac, Esq.
      POLLACK, POLLACK, ISAAC & DE CICCO, LLP
      *Appellate Counsel*
      225 Broadway, Suite 307
      New York, New York 10007
      212-233-8100

Brian J. Isaac, Esq.
Kenneth J. Gorman, Esq.
Michael H. Zhu, Esq.

        Of Counsel

## CERTIFICATE OF COMPLIANCE WITH FRAP 32(a)

1.   This brief complies with the type-volume limitation of
Fed. R. App. P. 32(a)(7)(B) because this brief contains
13,411 words, excluding the parts of the brief exempted
by Fed. R. App. P. 32(a)(7)(B)(iii).


2.   This brief complies with the typeface requirements of
Fed. R. App. P. 32(a)(5) and the type style
requirements of Fed. R. App. P. 32(a)(6) because this
brief has been prepared in a monospaced typeface using
Microsoft Word in Courier New, 12 point font.


            _____s/ Brian J. Isaac_____ _
            Brian J. Isaac, Esq.
            POLLACK, POLLACK, ISAAC & DE CICCO,LLP
            *Appellate Counsel*
            225 Broadway, Suite 307
            New York, New York 10007
            212-233-8100

SPECIAL APPENDIX

## Table of Contents

**Page**

Memorandum Decision and Order of the
   Honorable Loretta A. Preska, dated March 25, 2014,
   Appealed From ................................................................ SPA1

Notice of Appeal, dated April 14, 2014 .............................................. SPA30

```
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/25/2014
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
FERNANDO BERMUDEZ,                :        11 Civ. 750 (LAP)
                                  :
            Plaintiff,            :        MEMORANDUM AND ORDER
                                  :
      v.                          :
                                  :
THE CITY OF NEW YORK, JAMES       :
RODRIGUEZ, individually and       :
as Assistant District            :
Attorney of New York County,     :
ET AL.,                           :
                                  :
            Defendants.           :
------------------------------x

LORETTA A. PRESKA, Chief United States District Judge:

      Plaintiff Fernando Bermudez ("Plaintiff" or "Bermudez")

brings this action pursuant to 42 U.S.C. § 1983 ("section 1983")

against Defendants the City of New York, former Assistant

District Attorney of New York County James Rodriguez ("ADA

Rodriguez")[1], Daniel Massanova ("Massanova"), Michael Lentini

("Lentini"), John Mulalley ("Mulalley") (together "Defendants"

or "the Officer Defendants") and various members of the New York

City Police Department.  Plaintiff's amended complaint [dkt. no.

24] claims Defendants violated his rights by falsifying evidence

and documents, conspiring and participating in a malicious

---
[1] This Court granted ADA Rodriguez's Motion to Dismiss on February 13, 2013
[dkt. no. 46]; therefore, ADA Rodriguez is no longer a defendant in this
case.

prosecution, various state law and <u>respondeat superior</u> claims.[2]
Defendants the City of New York, Massanova, Lentini, and
Mulalley[3] now move for summary judgment pursuant to Fed. R. Civ.
P. 56. For the reasons set forth below, Defendants' motion for
summary judgment [dkt. no. 54] is GRANTED.

I. BACKGROUND[4]

    a. <u>The Shooting</u>

On August 3, 1991, Efrain "Pito" or "Shorty" Lopez
("Lopez") attended a party at the Marc Ballroom, in the Union
Square neighborhood of Manhattan and engaged in an altercation
with Raymond "Dred" Blount ("Blount"). <u>See</u> Def. 56.1 Stmt.
¶¶ 1-2. Several individuals observed the altercation or the
aftermath of the altercation, including Jamie Velazquez
("Velasquez"), Frank Kent ("Kent"), Okpa Iyesi ("Iyesi"), and
Michael Thompson ("Thompson"). <u>Id.</u> ¶ 4. In the general
vicinity of the altercation Iyesi and Velazquez noticed a man

---

[2] By letter dated February 25, 2013 Plaintiff voluntarily withdrew his claims against Massanova, Lentini, and Mulalley for false arrest, false imprisonment, and intentional infliction of emotional distress. [Dkt. no. 51].

[3] While Plaintiff's amended complaint names several unknown members of the New York Police Department [dkt. no. 24], the three officers who have been served process are Massanova, Lentini, and Mulalley [dkt. nos. 25-28].

[4] The following facts are taken from Defendants' Statement of Material Facts Pursuant to Local Civil Rule 56.1 ("Def. 56.1 Stmt."), Plaintiff's Responsive Statement to Defendants' Statement Pursuant to Local Civil Rule 56.1 ("Pl. 56.1 Resp."), Defendant's Response to Plaintiff's Statement of Additional Facts Pursuant to Local Rule 56.1 ("Def. 56.1 Resp."), and all accompanying declarations and exhibits. This Court will "consider the totality of the parties' submissions in identifying disputed material facts and will construe those disputed facts in [the non-movant's] favor as is appropriate on summary judgment." <u>Hamilton v. Bally of Switz.</u>, No. 03 Civ. 5685, 2005 WL 1162450, at *9 (S.D.N.Y. May 12, 2005).

with dark hair in a "fade" style[5] in a white t-shirt.[6]  Id. ¶¶ 5-8.  Velazquez pointed the man out to Thompson who noted his gold medallion and noticed his face.  Id. ¶ 9.

Later in the evening, Lopez encountered an individual named Luis "Lou" Munoz, known by the nickname "Wool Lou" inside the ballroom and told him that he had been in a fight.  Id. ¶¶ 10, 13; Pl. 56.1 Resp. ¶¶ 10-11.  That night, Wool Lou wore a white t-shirt with a black design, beige shorts, a chain with a medallion, and styled his hair in a fade.  Def. 56.1 Stmt. ¶ 12.

At approximately 3:00 a.m., Blount, Velazquez, Lawrence Darden ("Darden"), Thompson, Kent, Iyesi, Nkosi Boyce ("Boyce"), Terrence Hall ("Hall") and others left the Ballroom and observed a group of Hispanics across the street, one of whom was wearing a gold medallion and who Kent recognized as someone he had seen at another club.  Id. ¶¶ 14-17.  Wool Lou approached Lopez and asked him which one had hit him earlier and Lopez gestured toward Blount.  Id. ¶¶ 18-19.  Wool Lou walked up to a black Pathfinder parked near the groups and spoke to the individual inside.  Id. ¶ 20.  When Blount's group began walking away the Pathfinder cut them off and a man with a cane stepped out of the vehicle asking Lopez to identify the person who punched him.

_____

[5] A "fade" hairstyle means that the cut is shorter on the side and longer on the top.  Def. 56.1 Stmt. ¶ 5.
[6] Velazquez noticed that man's white t-shirt had black lettering on it and he was wearing light blue shorts.  Def. 56.1 Stmt. ¶ 7.

3

Id. ¶¶ 23-25.  Lopez identified Blount as the individual who punched him and the man, known to Lopez as Wool Lou, produced a gun and shot Blount.  Id. ¶ 27.  Iyessi, Thompson, Kent, and Velazquez recognized the shooter as someone they had seen earlier in the night.  Id. ¶¶ 28-31.  Shortly after the shooting, police officers arrived on the scene and an ambulance removed Blount to St. Vincent's Hospital, where he died of his injuries.  Id. ¶ 41.

   b. The Police Investigation

   On August 4, 1991, Massanova was assigned to handle the investigation into the Blount homicide.  Lentini and Detective William Fitzpatrick took Hall, Darden, Boyce, Kent, Velasquez, Thompson, and Iyesi to the CATCH unit to view photographs.[7]  Id. ¶ 43, Pl. 56.1 Resp. ¶¶ 255-57.  Lentini asked the group for a collective description of the shooter and the man whom Blount punched in the club and then gave the witnesses photographs based on their description.  Def. 56.1 Stmt. ¶¶ 47-49.  Lentini testified that Darden, Boyce, and Hall viewed photographs first to identify the individual Blount punched.  Next Velazquez, Kent, Thompson, and Iyesi viewed photographs to identify the shooter.  Id. ¶¶ 49-54.  Plaintiff indicates that subsequent

---

[7] A CATCH Unit is maintained by the NYPD in each borough and is the location of photographs of prior arrestees along with information such as ethnic background, age, height, and weight.  Def. 56.1 Stmt. ¶ 44.

4

testimony shows the witnesses viewed the photographs together as a group.  Pl. 56.1 Resp. ¶ 49.

Darden identified a picture of Efrain Lopez as "Shorty," the man whom Blount punched, and Velazquez identified two photographs she thought depicted the shooter.  One of the photographs was of Fernando Bermudez.  Id. ¶¶ 51-52, 56-61. Later, Massanova showed Velazquez, Kent, Iyesi, and Thompson a six-person photo arrangement with Lopez's picture.  All identified him as the person whom Blount punched inside the nightclub.  Id. ¶ 65.  Massanova also showed Darden, Thompson, Boyce, Hall, Iyesi, and Kent a six-person photo arrangement containing Bermudez's picture.  Darden and Boyce failed to identify anyone in the line-up.  Thompson identified Bermudez as the shooter.  Hall and Iyessi noted that Bermudez was there. Kent identified Bermudez as "the kid with the gold chain who reached behind his back for a gun."  Id. ¶ 66.

On August 5, 1991, Massanova located Lopez and brought him into the station for about twenty-eight hours.  Id. ¶¶ 67-69. While at the station, Lopez was interviewed, viewed a photo array, prepared three handwritten statements, and made a videotaped statement.  Id. ¶ 70.  Lopez identified Bermudez's picture in the photo array as the shooter and provided physical descriptions of Bermudez and the shooting.  Id. ¶¶ 71-75.  Lopez

also indicated that he knew the shooter by the nickname "Wool Lou" and had known him from his grandmother's neighborhood.  Id. ¶¶ 74-75.

On August 6, 1991, Mulalley took Bermudez into custody and processed his arrest.  Id. ¶¶ 76-77.  That same day, Massanova contacted ADA Rodriguez of the Manhattan DA's Office, told him that they had a suspect in the Blount homicide, and informed him that witnesses had identified Bermudez as the shooter.  Id. ¶¶ 78-79; Pl. 56.1 Resp. ¶¶ 294-99.  ADA Rodriguez reviewed witness statements as Massanova and Mulalley conducted a lineup. Darden, Boyce, and Hall did not recognize anyone in the lineup and Velazquez, Kent, Iyesi, and Thompson identified Bermudez as someone they recognized.  Def. 56.1 Stmt. ¶ 80.  ADA Rodriguez then interviewed all the witnesses and subsequently decided to present the charges against Bermudez to a grand jury with Thompson and Velazquez as witnesses.  Id. ¶¶ 81-84.

That evening Bermudez gave a videotaped statement to Massanova and ADA Rodriguez with his account of the evening. Id. ¶¶ 85-89.  Lopez also gave a videotaped statement to Massanova and ADA Rodriguez during which he identified the shooter in a photo array that he had seen previously.  Id. ¶¶ 90-92.  Massanova told ADA Rodriguez that he did not believe Lopez was telling the whole truth regarding the Blount shooting.

6

Id. ¶¶ 94-95.  Despite disagreeing with Massanova about whether Lopez should be charged in connection with the Blount homicide, ADA Rodriguez chose not to charge Lopez with any involvement. Id. ¶ 95.  ADA Rodriguez then took videotaped statements from individuals claiming to have been with Bermudez the night of the shooting.  Id. ¶ 96.  Finally, ADA Rodriguez drafted the criminal complaint for Massanova to sign.  Id. ¶ 97.

   c. The Pre-Trial Proceedings

ADA Rodriguez presented the evidence to the grand jury where Velazquez and Thompson were the only eyewitnesses to testify.  Id. ¶¶ 98-101.  On or about August 9, 1991, a New York County grand jury returned an indictment against Bermudez charging him with murder in the second degree.  Id. ¶ 98.

On December 20, 1991, Judge John K. Bradley held a Wade hearing to determine the admissibility of the photographic and lineup identification procedures conducted in the Bermudez investigation.  Id. ¶ 102.  Judge Bradley ruled from the bench that the pretrial identification procedures were not unduly suggestive and were conducted properly.  Id. ¶ 103-106.

On January 14, 1992, Lopez and his attorney entered into a cooperation agreement with ADA Rodriguez.  Lopez agreed to testify truthfully at Bermudez's trial and not assert his Fifth Amendment privilege against self-incrimination, and ADA

7

Rodriguez agreed not to prosecute Lopez in connection with the Blount homicide.  Id. ¶ 107.  ADA Rodriguez met with the civilian witnesses, including Velasquez, Thompson, Kent, and Iyesi, to prepare them for trial.  Id. ¶ 108.  ADA Rodriguez stated that, "at no time did any of those witnesses ever tell [him] they were mistaken or they wanted to change their prior photographic or lineup identification of the person they identified during the procedure[s]."  Declaration of Elizabeth Norris Krasnow ("Krasnow Decl."), Exhibit S at 38:24-39:35, 45:2-19.  Witnesses Velazquez, Thompson, Kent, and Iyesi all subsequently stated that at various times before trial they expressed doubts to ADA Rodriguez specifically and to the police about their identification of Bermudez and their reluctance to testify.  Infra at 10-12.

      d. The Trial

    On January 16, 1992, Bermudez's trial began in front of Judge Bradley.  Def. 56.1 Stmt. ¶ 109.  Lopez, Velazquez, Kent, Iyesi, and Thompson testified for the prosecution, identified Bermudez in court, and described the events of the shooting.  Id. ¶¶ 110-119.[8]  Members of Bermudez's family made frequent outbursts in court, approached witnesses themselves telling the witnesses they were mistaken, and hired an investigator who

_____

[8] Thompson, Iyesi, and Lopez each testified that Bermudez shot at Blount. Def. 56.1 Stmt. ¶¶ 114, 120.

approached witnesses indicating Bermudez was not the shooter.
<u>Id.</u> ¶¶ 111-12, 121.

Bermudez presented an alibi defense and described his
activities on the night of the Blount shooting.  He denied that
his nickname was Wool Lou and stated that he was known instead
as "Most."  <u>Id.</u> ¶¶ 122-24.  Darden, Boyce, and Hall, the
witnesses who did not identify Bermudez during pre-trial
identification procedures testified on his behalf but did not
claim to identify the shooter.  <u>Id.</u> ¶¶ 126-127.

On February 2, 1992, the jury convicted Bermudez of murder
in the second degree.  <u>Id.</u> ¶ 128.

### e. The Post-Trial Motions

After Bermudez's conviction a private investigator working
for Bermudez brought information to Massanova's attention that
Lopez had a friend who went by the name Wool Lou who had
recently left the state.  <u>Id.</u> ¶ 19.  Massanova brought the
information to ADA Rodriguez's attention, but ADA Rodriguez
believed Lopez misidentified Bermudez "by name only to mislead
the police during the videotape interview [ADA Rodriguez] took
of him."  <u>Id.</u> ¶¶ 131-134.  When confronted by the investigator
in person, Lopez repeatedly denied that he identified the wrong
person and stated that he had not been coerced by the prosecutor
or law enforcement.  <u>Id.</u> ¶¶ 134-135.

9

On or about September 18, 1992, Bermudez was sentenced to
twenty-three years to life in prison.  Id. ¶ 144.  Both prior to
sentencing and after sentencing Bermudez brought numerous
motions in state court seeking relief from his conviction.  ADA
Rodriguez opposed the relief sought in connection with each
motion filed.  Id. ¶¶ 136-43.  Bermudez filed four motions to
vacate his conviction pursuant to C.P.L. § 440.10.  All four
were denied by Judge Bradley.[9]  Id. ¶¶ 148-79.  Bermudez filed an
application for a writ of error coram nobis on the grounds that
his appellate counsel's failure to seek reversal of his
conviction based on ineffective assistance of trial counsel had
denied him effective assistance at the appellate level.  Id.
¶ 177.  The application was denied.  Id. ¶ 179.

On June 28, 2000 Bermudez filed a petition for a writ of
habeas corpus in the Southern District of New York alleging that
his conviction was based on perjured testimony and that his due
process rights were violated by impermissibly suggestive

_____

[9] The first § 440.10 motion was denied because the papers were in "disarray"
and Bermudez's lawyer presented "alleged exhibits that were not what they
purported to be."  Def. 56.1 Stmt. ¶¶ 148-50.  The second § 440.10 motion
included the five eyewitnesses who testified for the prosecution, recanting
their testimony.  Additionally, one eyewitness who testified for the defense
claimed to be able to identify the shooter for the first time.  Judge Bradley
denied the motion because the eye witnesses' testimony at trial was unshaken
and the actions of members of Bermudez's family and his investigators
discredited the recantations.  Id. ¶¶ 151-171.  The denial was affirmed by
the Appellate Division, and the Court of Appeals denied Bermudez's
application for leave to appeal.  Id. ¶¶ 172-73.  The third § 440.10 motion
was denied because it simply rehashed previous arguments.  Id. ¶¶ 174-76.
The fourth  § 440.10 motion alleged his counsel was incompetent at trial and
was denied.  Id. ¶ 179.

identification procedures.  Id. ¶ 181.  In November 2002, Magistrate Judge Fox held a hearing on the matter.  Id. ¶ 182. Witnesses Thompson, Iyesi, Velazquez, Kent, Darden, Boyce, and Lopez, Detectives Lentini and Massanova, ADA Rodriguez and Judge Bradley testified.  Id. ¶ 182.  The witnesses testified that they viewed pictures in the CATCH unit communally and discussed the pictures selected with each other.  Id. ¶ 183.  The witnesses testified that they expressed doubt to ADA Rodriguez and "the officers" during the identification procedures and particularly before trial.  Id. ¶¶ 183-219.

Thompson testified that he told ADA Rodriguez that he was unsure of his recollections after viewing the lineup and prior to trial.  Id. ¶¶ 186-189.  Thompson stated that he testified that Bermudez shot Blount at trial because he was "forced" and "coaxed" to go along with "what the DA and police officers told [him] to do" and that this was a product of "misjudgment" on his part.  Id. ¶¶ 185-190.

Iyesi testified that the witnesses all agreed in the CATCH unit as to who was present the night of the shooting.  Id. ¶ 191.  Iyesi believed his identification to be correct until he saw Bermudez at trial but continued to testify because ADA Rodriguez told him they had evidence that proved Bermudez was the shooter.  Id. ¶¶ 194-195.

11

Kent testified that he spoke to ADA Rodriguez twice about
his identification and that the second time he told him that he
did not want to testify.  He said ADA Rodriguez threatened to
have him arrested if he did not.  Id. ¶¶ 198-99.

Velazquez testified that she selected two photographs
during the CATCH unit identification procedures and that she
told ADA Rodriguez that the men looked alike.  Id. ¶¶ 202-207.
She noted that Massanova and ADA Rodriguez told her to pick
whoever looked similar, which is why she picked Bermudez in the
lineup.  Id. ¶ 208.  Velazquez testified that, up until trial,
she "continually" told ADA Rodriguez that she was not sure if
Bermudez was the shooter and that at trial told ADA Rodriguez
that she did not think Bermudez was the shooter.  Id. ¶¶ 209-13.

Lopez testified that Massanova directed him to pick
Bermudez during the photographic identification procedures.  Id.
¶ 214.  He also testified that he "fabricated" details to make
the story fit what ADA Rodriguez and Massanova wanted.  Id.
¶¶ 215-10.

On March 29, 2004, Magistrate Judge Fox issued a Report and
Recommendation which recommended that Bermudez's application for
a writ of habeas corpus be denied.  Id. ¶ 220.  Magistrate Judge
Fox found inconsistencies in the witnesses' post-trial
affidavits and their habeas hearing testimony regarding the

12

photo identification procedures. Additionally, Hall, Darden, and Boyce viewed the CATCH Unit photographs separately making the accuracy of the testifying witnesses suspect. Id. ¶ 221. Magistrate Judge Fox found that the CATCH Unit identification was impermissively suggestive because the witnesses freely discussed the photographs they were reviewing. Nevertheless, Bermudez could not establish a due process violation because the trial record showed that the witnesses observed the shooter outside of any police-arranged opportunities. Id. ¶ 223. Magistrate Judge Fox also found that the recantations of the eyewitnesses were unreliable and that Lopez's coercion claims were not credible. Id. ¶ 224.

This Court adopted Magistrate Judge Fox's Report and Recommendation in its entirety finding that the recantations were unreliable and the impermissible suggestive identification procedures at the CATCH Unit were not sufficient to establish a due process violation. Id. ¶¶ 226-27. This Court denied Bermudez's motion for a certificate of appealability. Bermudez subsequently filed a motion in the Second Circuit seeking a certificate of appealability which was denied, and his appeal was dismissed. Id. ¶¶ 228-30.

On October 3, 2008, Bermudez filed his fifth § 440.10 motion in state court before Judge John Cataldo and was granted

13

a hearing.  Id. ¶ 232.  The DA's Office conceded that Lopez
testified falsely at trial and that Luis Munoz was the real Wool
Lou.  Id. ¶ 232.  Judge Cataldo found, based on the newly
discovered evidence, that Bermudez was not Wool Lou and that
Magistrate Judge Fox and this Court's finding of unduly
suggestive identification procedures at the CATCH Unit warranted
§ 440.10(1)(g) and (5)(a) relief.  Id. ¶ 234; Pl. 56.1 Resp. ¶
254.  Judge Cataldo found that a collective identification of
Bermudez occurred in the CATCH Unit and that there was a "strong
factual basis for mistaken identification" because of the
"strong resemblance" between Munoz and Bermudez.  Pl. 56.1 Resp.
¶ 270, Def. 56.1 Stmt. ¶¶ 234-35.  Judge Cataldo found that ADA
Rodriguez knew or should have known, prior to the entry of
judgment, that Lopez gave materially false testimony at trial.
Def. 56.1 Stmt. ¶ 236.  Judge Cataldo vacated the judgment of
conviction and dismissed the indictment against Bermudez upon
finding that Bermudez was innocent of the Blount homicide.  Id.
¶ 236.  On November 19, 2009, Bermudez was released pending
execution of an unrelated sentence.  Id. ¶¶ 239-40.

Bermudez has since instituted a damages action against New
York State in the Court of Claims and filed a notice of claim
raising various state law claims against the City.  Id. ¶¶ 241-
42.  On February 3, 2011, Bermudez filed the instant civil
rights action against Defendants, the City of New York, multiple

14

prosecutors from the Manhattan DA's Office and retired NYPD officers. [Dkt. no. 1]. On June 10, 2011, Bermudez filed an amended complaint dropping all prosecutor defendants e ADA Rodriguez. [Dkt. no. 24]. Bermudez withdrew his claims for false arrest, false imprisonment, and intentional infliction of emotional distress. [Dkt. no. 51]. On February 14, 2013, this Court granted ADA Rodriguez's motion to dismiss Bermudez's claims. [Dkt. no. 46].

II.  <u>DISCUSSION</u>

   a. <u>Summary Judgment Standard</u>

   A moving party is entitled to summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any , show that there is no genuine issue as to any material fact and [that party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986) (citing language of previous Rule 56(c)). An issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>see also</u> <u>Overton v. New York State Div. of Military and Naval Affairs</u>, 373 F.3d 83, 89 (2d Cir. 2004). A material fact is a fact that "might affect the outcome of the suit under the governing law." <u>Id.</u> "Conclusory allegations, conjecture, and speculation, however,

are insufficient to create a genuine issue of fact." <u>Kerzer v. Kingly Mfg.</u>, 156 F.3d 396, 400 (2d Cir. 1998).

The party moving for summary judgment has the burden of proving that no genuine issue of material fact exists. <u>See Grady v. Affiliated Central, Inc.</u>, 130 F.3d 553, 559 (2d Cir. 1997.). In determining whether summary judgment is appropriate, the Court must construe the evidence in the light most favorable to the non-moving party. <u>See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986); <u>Lucente v. IBM Corp.</u>, 310 F.3d 243, 253 (2d Cir. 2002).

### b. Defendants' Motion for Summary Judgment

#### i. Proximate Cause

Plaintiff brings several claims against Defendants under section 1983. Section 1983 civil actions rely on the same analysis as state common law tort actions and serve the same primary goal of compensation. <u>See Townes v. City of New York</u>, 176 F.3d 138, 146 (2d Cir. 1999); <u>Wray v. City of New York</u>, 490 F.3d 189, 193 (2d Cir. 2007). "A [section 1983] action, like its state tort analogs, employs the principle of proximate causation." <u>Townes</u>, 176 F.3d at 146; <u>see also Wray</u>, 490 F.3d at 193 ("[section] 1983 should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions. Since the common law recognized the causal link between the submission of a complaint and an ensuing

16

arrest, we read [section] 1983 as recognizing the same causal link.")(internal quotations and citations omitted).

In Townes v. City of New York, plaintiff brought a section 1983 action against a police officer who performed an unreasonable search and seizure of plaintiff's person and the vehicle in which plaintiff was riding. 176 F.3d at 141. The Court of Appeals addressed the issue of whether the unreasonable search and seizure was the proximate cause of the plaintiff's conviction and incarceration. Id. at 146. The Court of Appeals held that the officer's actions were not the proximate cause of plaintiff's incarceration because of a superseding cause committed by the trial court.

> It is arguable that such seizures and searches could foreseeably cause the discovery of inculpatory evidence, but as a matter of law, the unconstitutional seizure and search of [plaintiff's] person was not a proximate cause of his conviction because of (at least) one critical circumstance: the trial court's refusal to suppress the evidence, which is an intervening and superseding cause of [plaintiff's] conviction.

Id. The Court of Appeals recognized that but for the officer's unreasonable search and seizure, plaintiff would not have been incarcerated. Nevertheless, the Court of Appeals held that "the trial court's failure to suppress the evidence concerning [plaintiff's] own criminal acts constituted a superseding cause of [plaintiff's] conviction and imprisonment."[10]  Id. at 147.

---

[10] The Restatement (Second) of Torts § 440 (1965) defines a superseding cause as "an act of a third person-or other force which by its (continued)

17

In *Wray v. City of New York*, 490 F.3d 189 (2d Cir. 2007), the Court of Appeals held that *Townes* should not be limited to Fourth Amendment violations.  In *Wray*, plaintiff brought a section 1983 claim against an officer who conducted an unduly suggestive line up claiming that the officer violated his constitutional due process and fair trial rights.  Id. at 192-93.  The Court of Appeals held that "[i]n the absence of evidence that [the officer] misled or pressured the prosecution or trial judge, we cannot conclude that his conduct caused the violation of [plaintiff's] constitutional rights;" instead, "the violation was caused by the ill-considered acts and decisions of the prosecutor and trial judge."  Id. at 193.  The Court of Appeals recognized that the causation claimed by defendant was "even more tenuous that the causation alleged in *Townes*."  Id. at 194.  The officer's use of a suggestive show-up identification did not rise to the level of a constitutional violation by itself.  Id. at 193.  Rather, it was the use of that suggestive show-up during defendant's trial, at the suggestion of the prosecutor, that constituted a constitutional violation; therefore, the officer responsible for the suggestive show-up could not be held liable under section 1983.  Id. at 194.

---

(continued) intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about."

Here, Plaintiff alleges that the Officer Defendants'
misconduct[11] during this investigation violated his
constitutional rights.  [Dkt. no. 24 ¶ 223].  The Officer
Defendants conducted a series of CATCH sessions where the seven
potential witnesses viewed photographs in an attempt to identify
the person who was punched in the club and the person who had
shot Blount.  Def. 56.1 Stmt. ¶¶ 42-48; Krasnow Decl., Ex. K
(Wade hearing transcript).  After several witnesses identified
Plaintiff's photograph as the individual who shot Blount,
Sergeant Mulalley arrested Plaintiff in connection with the
murder.  Def. 56.1 Stmt. ¶¶ 66(b) & (e), 71, 76.

After this time, ADA Rodriguez broke the chain of causation
between the Officer Defendants and Plaintiff's conviction and
incarceration.  Prior to filing charges against Plaintiff, ADA
Rodriguez interviewed all of the witnesses who had viewed the
identification lineup, both those who had identified Plaintiff
and those who had not.  Id. ¶¶ 81-92.  ADA Rodriguez
subsequently drafted the complaint (Krasnow Decl., Ex. S at
28:11-14), participated in and presented the evidence at the
grand jury proceedings (Krasnow Decl., Ex. S at 31:9-19, Ex. W
at 3:1-11, 10:1-10), prepared the witnesses for trial (Krasnow

---

[11] Plaintiff's allegations of police misconduct are weakly supported by
testimony from witnesses Lopez, Velazquez, and Thompson.  As noted infra, the
fact that each of these witnesses divulged their doubts about Plaintiff's
being the shooter to ADA Rodriguez makes clear that ADA Rodriguez knew all
the information when he independently chose to prosecute Plaintiff for the
crime.

Decl., Ex. S at 38:24-39:35, 45:2-19), oversaw the evidence
presented at trial (Def. 56.1 Stmt. ¶¶ 114-120), and presided
over the People's response to Plaintiff's post-trial motions
(Krasnow Decl., Ex. S at 714:17-715:20).

During the investigation, Massanova was not convinced that
Lopez was telling the whole truth to the detectives.  He felt
that Lopez was more involved in the shooting than he was saying
and Massanova considered bringing charges against Lopez.
Massanova brought his concerns to ADA Rodriguez's attention and
deferred to his judgment when ADA Rodriguez decided to proceed
on Lopez's information and allegations.  Def 56.1 Stmt. ¶¶ 68,
93-95, 107.  Even if the Officer Defendants' behavior during the
investigation constitutes misconduct, ADA Rodriguez's actions in
initiating and participating in this case from the moment of the
criminal complaint constitute a superseding cause of Plaintiff's
conviction and imprisonment.  The evidence presented shows that
ADA Rodriguez himself independently investigated all the
witnesses and managed the criminal charges against and
prosecution of Plaintiff himself.

Plaintiff argues that the misconduct of the Officer
Defendants was deliberately hidden from the subsequent decision
maker, ADA Rodriguez, and therefore, the chain of causation is
not broken.  Pl. Br. at 5.  It is well established that the
chain of causation will survive where there is "evidence that

the police officer misled or pressured the official who could be
expected to exercise independent judgment." Townes, 176 F.3d at
147. Despite his allegation, Plaintiff puts forth no evidence
that the Officer Defendants misled or pressured ADA Rodriguez
into filing charges against Plaintiff. Their alleged misconduct
in conducting the indentifying procedures cannot be said to have
misled ADA Rodriguez as he interviewed all the witnesses himself
and was the ultimate decision maker with regard to bringing
charges against Bermudez. Accordingly, Defendants' motion for
summary judgment on the issue of proximate cause is granted, and
Plaintiff's claims under section 1983 are dismissed.

     ii. Qualified Immunity

     Defendants are also protected under qualified immunity. A
police officer may rely on qualified immunity where "(a) it was
objectively reasonable for the officer to believe that probable
cause existed, or (b) officers of reasonable competence could
disagree on whether the probable cause test was met." O'Neil v.
Town of Babylon, 986 F.2d 646, 649-50 (2d Cir. 1993) (internal
quotations and citations omitted). An officer's actions are
unreasonable and undeserving of qualified immunity when "no
officer of reasonable competence could have made the same choice
in similar circumstances." Anthony v. City of New York, 339
F.3d 129, 138 (2d Cir. 2003) (quotation omitted). Police
officers are "entitled to rely on the victims' allegations that

21

a crime has been committed." <u>Martinez v. Simonetti</u>, 202 F.3d 625, 634 (2d Cir. 2000).

Here, the Defendants had probable cause to arrest Bermudez in connection with the Blount homicide. At the time of his arrest, five eyewitnesses had identified Bermudez as either the shooter or having been present at the scene and approached Blount with a gun prior to the shooting. Def. 56.1 Stmt. ¶¶ 59, 61, 66(b)-(e), 71, 80(b), 90-92. The eyewitnesses' subsequent recantations have been discredited in several courts but even taken as true, they do not negate probable cause. Officers are permitted to rely on witnesses' allegations of the existence of a crime to satisfy the probable cause requirement.

Finally, Bermudez cannot rebut the presumption of probable cause to prosecute because his indictment was based on Velazquez and Thompson's grand jury testimony. <u>Id.</u> ¶¶ 99-101. Bermudez seeks to rebut the presumption by arguing that the Officer Defendants fabricated false identifications and forwarded the false evidence to the prosecutor for use at trial. Pl. Opp. at 27. Bermudez argues that the improperly conducted photo identification procedures were false information and evidence sufficient to negate the presumption of probable cause. This Court held that the suggestive identification procedures did not violate Bermudez's due process rights because all of the witnesses had an opportunity to observe Bermudez outside of the

police-arranged opportunities.  Def. 56.1 Stmt. ¶¶ 222-28.
Additionally, ADA Rodriguez himself interviewed both Thompson
and Velazquez prior to their grand jury testimony and made the
decision to have them testify.  Id. ¶¶ 81-84.  ADA Rodriguez's
personal involvement in the preparation of the grand jury
testimony demonstrates that he did not rely on "false evidence"
for the indictment.  Accordingly, Bermudez has not presented
evidence sufficient to determine that reasonable minds could
differ as to the issue of probable cause.  The Defendants had
sufficient probable cause to meet the standard of "arguable
probable cause" and are entitled to qualified immunity.

       iii.  Remaining State Law Claims

          A. State Law Malicious Prosecution Claim

To succeed on a section 1983 or state law malicious
prosecution claim the plaintiff must demonstrate: "that (1) the
defendant either commenced or continued a criminal proceeding
against him; (2) that the proceeding terminated in his favor;
(3) that there was no probable cause for the criminal
proceeding; and (4) that the criminal proceeding was instituted
in actual malice."  Russo v. State of New York, 672 F.2d 1014,
1018 (2d Cir. 1982).

As to the first element, "there is a presumption that a
prosecutor exercises independent judgment in deciding whether to
initiate and continue a criminal proceeding."  Alcantara v. City

of New York, 646 F. Supp. 2d 449, 457 (S.D.N.Y 2009) (quoting
Crenshaw v. City of Mount Vernon, 06-CV-2722, 2008 WL 4452223,
at *8 (S.D.N.Y. Sept. 30, 2008)).  This presumption may be
overcome if Plaintiff can demonstrate that "the defendant played
an active role in the prosecution, such as giving advice and
encouragement or importuning the [prosecutor] to act."  Espada
v. Schneider, 522 F. Supp. 2d 544, 553 (S.D.N.Y. 2007)
(quotation omitted).  Courts have found a triable issue of fact
as to the initiation element where the defendant officer
"actively elicited inculpatory statements from witnesses"
Manganiello v. City of New York, 612 F.3d 149, 163 (2d Cir.
2010), or "had the person arraigned, filled out complaining and
corroborating affidavits, swore to and signed a felony
complaint, or created false information and forwarded it to
prosecutors," Acantara, 646 F.Supp. 2d at 457-58 (quotations
omitted).

　　　Even assuming arguendo that the allegations of police
misconduct are true, ADA Rodriguez interviewed all of the
witnesses himself and subsequently chose to bring charges and
draft the criminal complaint. See Krasnow Decl., Ex. S at 25:10-
19 ("At some point that afternoon I sat down and spoke to each
individual witness and went over any statements they had
including the lineup results, and including those witnesses who
didn't make the lineup identification . . . .  I then made the

24

decision at that point that I was going to present the case to the grand jury.")  Plaintiff has presented no evidence that indicates the Defendant Officers pressured ADA Rodriguez to bring charges against Plaintiff.  Plaintiff has also presented no evidence that indicates ADA Rodriguez brought charges based solely upon the identification procedures.

In fact, ADA Rodriguez himself notes that he decided to bring charges against Plaintiff after his own conversations with all the witnesses.  Id.  Further, it is undisputed that ADA Rodriguez and Massanova disagreed about whether to charge Lopez in connection with the Blount murder.  Krasnow Decl., Ex CCC at 757:8-24; Def. Stmt. ¶¶ 93-95.  Despite this disagreement and Massanova's opinion on the matter, ADA Rodriguez chose not to charge Lopez.  See id.

It is undisputed that the proceeding has terminated in Bermudez's favor so it is not necessary for the Court to address the second element.

The third element of a malicious prosecution claim requires that there was no probable cause for the criminal proceeding. Russo, supra.  The standard for probable cause in malicious prosecution claims is higher than the probable cause standard in qualified immunity defenses so this Court will address probable cause below.  "Probable cause requires an officer to have knowledge or reasonably trustworthy information sufficient to

warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." Panetta v. Crowley, 460 F.3d 388, 395 (2d Cir. 2006) (quotations omitted).  It is also well established that information provided to the officers by putative victims or eyewitnesses satisfies the element of probable cause.  Id.

Under New York law, there is a presumption of probable cause created by the fact that a grand jury indicts the accused that may be used in defending against a malicious prosecution claim.  See Green v. Montgomery, 219 F.3d 52, 60 (2d Cir. 2000) certified question accepted, 95 N.Y.2d 829, 734 N.E.2d 1209 (2000) and certified question answered, 95 N.Y.2d 693, 746 N.E.2d 1036 (2001).  This presumption may be overcome "by evidence that the indictment was the product of fraud, perjury, the suppression of evidence by the police, or other police conduct undertaken in bad faith."  Green, 219 F.3d at 60 (quotations omitted).

The Court of Appeals found no evidence of bad faith on the part of the officers where a cooperating witness misidentified plaintiff.  That the cooperating witness misidentified the plaintiff was not enough to overcome the presumption of probable cause based on an indictment.  Id.

Here, prior to formal charges being filed, five individual witnesses had identified Plaintiff as the individual who either

26

shot Blount or approached Blount with a gun moments before the

shooting.  Def. 56.1 Stmt. ¶¶ 59-61, 66(b)-(e), 71, 80(b), 90-

92.  Officers may rely on the statements of witnesses to a crime

to satisfy probable cause.  Additionally, Plaintiff cannot rebut

the presumption of probable cause to prosecute because the

indictment was based on the grand jury testimony of Velazquez

and Thompson.  Id. ¶¶ 99-109.  Plaintiff argues that he can

rebut the presumption because the Defendant Officers withheld

information from ADA Rodriguez, falsified information, and that

their suggestive identification procedures tainted ADA

Rodriguez's investigation of Blount's murder.  Pl. Br. at 16.

Plaintiff offers no evidence that the Defendant Officers

withheld information or falsified evidence.  The evidence that

the Officer Defendants conducted suggestive identification

procedures is not sufficient to rebut the presumption of

probable cause.  Because ADA Rodriguez had the opportunity to

observe the witnesses several times and interviewed them

personally, the Officer Defendants' suggestive identification

procedures do not constitute fraud, perjury, or the suppression

of evidence and do not negate the presumption of probable cause.

Fourth, actual malice must be a motivation for the

Defendants' actions.  Jocks, 316 F.3d at 136.  "[T]he existence

of probable cause on the[] facts precludes a finding of malice

as there is no 'improper motive' in following through on the

27

prosecution of a defendant lawfully arrested". <u>Husbands ex rel.</u>
<u>Forde v. City of New York</u>, 05-CV-9252, 2007 WL 2454106 cite?
(S.D.N.Y. Aug. 16, 2007) <u>aff'd</u>, 335 F. App'x 124 (2d Cir. 2009).
As discussed <u>supra</u>, Defendants had probable cause to arrest
Bermudez and therefore were not motivated by malice.

Bermudez's argument that malice can be inferred from the
suggestive identification procedures and the closure of the
police investigation after Lopez identified Bermudez fail
because the witnesses had several opportunities to observe
Bermudez and ADA Rodriguez made the decision to credit the
witnesses' statements to the Defendant Officers. Defendants are
entitled to summary judgment with respect to Bermudez's
malicious prosecution claim.

B. State Law Negligent Infliction of Emotional
Distress Claim

Negligent infliction of emotional distress may not be based
on intentional conduct. "A plaintiff cannot assert a [negligent
infliction of emotional distress] claim based on intentional
act, such as an arrest." <u>Simon v. City of New York</u>, 09-CV-1302,
2011 WL 317975, at *17 (E.D.N.Y. Jan. 3, 2011) <u>report and</u>
<u>recommendation adopted</u>, 09-CV-1302, 2011 WL 344757 (E.D.N.Y.
Feb. 1, 2011). Bermudez alleges intentional acts such as arrest

28

and prosecution, and, accordingly, his negligent infliction of emotional distress claim cannot stand as a matter of law.

C. State Law Respondeat Superior Claim

Because the Defendants are entitled to summary judgment on all of Bermudez's state law claims, the City is not liable under a theory of respondeat superior.

D. State Law Negligent Supervision Claim

Plaintiff concedes that the negligent supervision claim should be dismissed. Pl. Br. at 29. As both parties are in agreement, Plaintiff's negligent supervision claim is dismissed.

I.    CONCLUSION

For the foregoing reasons Defendants' motion for summary judgment [dkt. no. 54] is GRANTED. The Clerk of the Court shall mark this action closed and all pending motions denied as moot.


SO ORDERED.
Dated:  March 25, 2014

_____
LORETTA A. PRESKA
Chief U.S. District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
FERNANDO BERMUDEZ,

                              Plaintiff,              11 CV 750 (LAP)

          -against-                                  **NOTICE OF APPEAL**


THE CITY OF NEW YORK, MICHAEL LENTINI,
WILLIAM FITZPATRICK, DANIEL MASSANOVA, JOHN
MULALLEY, BAKER (FIRST NAME UNKNOWN)

                              Defendants.
-----------------------------------------------------------------------X

     Notice is hereby given that the following parties, Plaintiff FERNANDO BERMUDEZ, in the

above-named case appeals to the United States Court of Appeals for the Second Circuit from the

Order of the Honorable Loretta A. Preska, entered on March 28, 2014, that granted Defendants'

motion for summary judgment.


Dated:         New York, New York
               April 14, 2014

                              Yours, etc.


                              _____   _____
                              RYAN J. LAWLOR (RL-7354)
                              LAW OFFICES OF MICHAEL S. LAMONSOFF,
                              PLLC
                              Attorneys for Plaintiff
                              FERNANDO BERMUDEZ
                              80 Maiden Lane, 12th Floor
                              New York, New York 10038
                              (212) 962-1020